NAUTILUS MARINE ENTERPRISES
INC., Appellant,

v.

VALDEZ FISHERIES DEVELOPMENT
ASSOCIATION, a non-profit Alaska
corporation, Appellee.

No. S–7125.

Supreme Court of Alaska.

Aug. 15, 1997.

Phillip Paul Weidner, Weidner & Associates, Inc., Anchorage, and Edward P. Weigelt, Jr., Hutchison, Foster & Weigelt, Lynnwood, Washington, for Appellant.

Stephen McAlpine, Law Offices of Stephen McAlpine, Anchorage, for Appellee.

Before COMPTON, C.J., and RABINOWITZ, MATTHEWS, EASTAUGH, and FABE, JJ.

COMPTON, Chief Justice.

## I. INTRODUCTION

Nautilus Marine Enterprises, Inc. appeals from a judgment entered on a jury verdict awarding damages to Valdez Fisheries Development Association under a contract to buy and sell pink salmon. We affirm.

## II. FACTS AND PROCEEDINGS

Nautilus Marine Enterprises, Inc. (Nautilus) and Valdez Fisheries Development Association (VFDA) entered into a contract for the purchase of pink salmon during the 1993 commercial fishing season. Under this contract, VFDA would sell, and Nautilus would buy, up to 50,000 fish a day. This mutual obligation to sell and buy was subject to a higher bidder's priority right to buy 50,000 pounds of fish per day from VFDA. Once this priority was met, Nautilus would then be entitled to up to 50,000 fish a day.[1] VFDA agreed to provide "up to 50,000 fish per day ... as available." The contract recognized that VFDA "cannot guarantee the time, numbers, and quality of the fish returning."

The contract provided that Nautilus would pay VFDA within forty-eight hours of its receipt of a given day's fish ticket or invoice, and that a failure to make such payment within forty-eight hours would "constitute grounds for suspension or termination of this contract until the problem is resolved...."

On July 1, a dispute arose over payment for fish delivered on June 29. VFDA accepted a $16,624.34 check from Nautilus for these fish. VFDA's accountant then either called or went to Nautilus's bank and was told that there were not sufficient funds in Nautilus's account to pay the check. VFDA suspended deliveries to Nautilus for that day. The check was presented to the bank late in the afternoon of July 1, and was honored. Deliveries recommenced on July 2.

Nautilus alleged that delivery shortages occurred over the next two weeks, basing this allegation on estimates VFDA provided the Alaska Commercial Fisheries Entry Commission and Department of Fish and Game. At the end of the contract period, Nautilus took a $32,418.37 offset against a portion of the purchase and sale price. VFDA disputed Nautilus's right to take this offset. It sued Nautilus for payment due under the contract. Nautilus counterclaimed against VFDA, alleging breach of contract.

At trial, Nautilus argued that the contract was an output contract, and that evidence regarding harvest quantity estimates and historical projections should be admitted to show that VFDA's actual harvest was unreasonably small, given the commercial expectations of the parties. The superior court sustained an objection to the admission of this evidence. It concluded that the contract un-

---

[1] The highest bidder contracted with VFDA for the purchase of *pounds* of fish. Nautilus contracted with VFDA for the purchase of *numbers* of fish.

ambiguously defined the parties' obligations, that extrinsic evidence regarding the parties' expectations was therefore unnecessary, and that the jury need only be instructed on an integrated contract.

The superior court instructed the jury on VFDA's obligation of good faith and fair dealing in satisfying the contract:

> The law imposes a covenant of good faith and fair dealing in every contract. This covenant cannot be disclaimed or waived by the parties. The covenant of good faith applies to all aspects of the contract, including its performance and enforcement. Good faith means honesty in fact. Good faith and fair dealings also mean that the parties must adhere to reasonable commercial standards and commercial reasonableness. However, if reasonable commercial standards and commercial reasonableness appear to conflict with the express terms of the parties' contract, the express terms of the contract control.

The jury found against Nautilus on VFDA's claim for money due under the contract, awarded VFDA $33,243.55, and denied Nautilus any recovery on its counterclaim.

Nautilus appeals.

## III. DISCUSSION

Nautilus raises several issues on appeal. First, Nautilus contends that the superior court erroneously concluded that the contract was not an output contract. Nautilus argues that because the contract was an output contract, evidence regarding VFDA's harvest quantity estimates and historical projections was wrongfully excluded, since such evidence would have been relevant in determining whether VFDA's output was reasonable, given the parties' commercial expectations. Second, Nautilus argues that the superior court erroneously instructed the jury on the effect of acceptance of a check on an underlying contractual obligation. Third, Nautilus claims that the jury's decision not to award damages for underdelivery of salmon was unsupported by the evidence. Finally, Nautilus argues that the jury erred in calculating the damages due VFDA.

### A. Output Contract/Excluded Evidence

The superior court concluded that the contract was not an output contract under AS 45.02.306(a).[2] It also concluded that whether or not the contract was an output contract, the evidence Nautilus sought to admit was not relevant. Because output in 1993 was considerably less than VFDA's estimates based on historical output, Nautilus contends that VFDA should be liable to it for this allegedly unreasonable disproportionality.

Under the contract, VFDA was obligated to sell Nautilus 50,000 pink salmon, "as available," after the first 50,000 pounds were sold to the highest bidder. If no fish were available, VFDA's obligation was zero.

 Nautilus's argument that the evidence it proffered was relevant in determining whether the amount of fish provided by VFDA was unreasonably disproportionate to the commercial expectations of the parties is unpersuasive.[3] As the superior court observed, "the terms of the contract in this case define the obligations of the parties. And nothing that I see in that contract calls ... these numbers, the VFDA projections, into that calculation." While it is true that VFDA's projections were contained in its solicitation for bid proposals,[4] these projections do not appear in the contract itself, and

---

2. An output contract measures the quantity of goods to be sold by the output of the seller. AS 45.02.306(a) provides:

 A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, except that no quantity unreasonably disproportionate to a stated estimate or, in the absence of a stated estimate, to a normal or otherwise comparable prior output or requirements may be tendered or demanded.

3. The standard of review for the superior court's evidentiary rulings is abuse of discretion. *Buster v. Gale*, 866 P.2d 837, 841 n. 9 (Alaska 1994).

4. VFDA's bid proposal stated:

 VFDA is soliciting proposals for the sale of pink salmon. Approximately 2,265,000 pink salmon, or 7 million pounds are being offered between June 25th and July 20th.

quantity issues are dealt with fully in the integrated contract.[5]

The contract states a maximum limit on VFDA's obligation to Nautilus: 50,000 fish per day "as available." It also clearly states that, due to "the nature of salmon returning to a fishery," VFDA "cannot guarantee the time, numbers, and quality of the fish returning." These provisions demonstrate that the parties understood that the number of fish available on any given day could reasonably vary anywhere between a minimum of zero fish to a maximum of 50,000 fish per day, since VFDA's obligation depended on availability.

The admissibility of extrinsic evidence hinged on whether the contract defined the parties' commercial expectations as to quantity. Because the contract contained limits on the parties' expectations on quantity, evidence of estimates, projections, and historical output was irrelevant, and therefore properly excluded by the superior court.[6]

### B. *Acceptance and Presentment Jury Instruction*

Nautilus contends that the superior court erred in instructing the jury on "the suspension of underlying contractual obligations upon acceptance of a check pending its presentment and honor or dishonor by the drawee bank."[7] Nautilus argues that its obligation to pay VFDA should have been suspended upon VFDA's acceptance of the check, until such time as VFDA actually presented the check for payment by Nautilus's bank and payment was refused.

The challenged portion of the instruction reads:

> Acceptance of a check ... does not suspend the underlying obligation if the party signing the check (the "drawer") has no reason to expect or right to require that the instrument be accepted as paid. In these circumstances presentment of the check is entirely excused. The drawer has no right to require that a check be accepted or paid by a drawee bank where it has insufficient funds on account to pay the check and has not established credit with the drawee bank to assure payment.

Former AS 45.03.511 reads in part:

> (b) Presentment ... is entirely excused if
>
> ....
>
> (2) the party has dishonored the instrument or has countermanded payment, or otherwise has no reason to expect or right to require that the instrument be accepted or paid....

AS 45.03.511 (*repealed* § 127 ch. 35 SLA 1993 (effective January 1, 1994)). While the wording of the jury instruction differs from that of the statute in small ways, the concepts expressed are substantially the same. The instruction provided the jury with a correct statement of the law it was to apply.

### C. *Jury Finding on Underdelivery*

Nautilus contends that the jury erred in not awarding Nautilus damages for

---

**5.** The integration clause stated:

This instrument is intended by the parties as a final expression of their agreement and as a complete and exclusive statement of its terms. This agreement can only be modified in writing signed by the authorized agents of each party.

**6.** Even were we to conclude that the superior court erred in determining this was not an output contract, the evidence would still be inadmissible. The Uniform Commercial Code § 2–306 envisions that output contracts may contain estimates of output in order to define reasonable variations in the actual output. (AS 45.02.306 is identical to UCC § 2–306.) The contract provided for 0—50,000 fish "as available." The elasticity of such an output contract, with a defined range, would be more narrow than a standard

output contract. *See* UCC § 2–306, cmt. 3 ("Any minimum or maximum set by the agreement shows a clear limit on the intended elasticity."). Were this an output contract, evidence of commercial expectations, based on output from prior years, or on estimates for the year at issue, would be irrelevant because the parties' expectations would be defined by the terms of the contract. Further, Nautilus cannot argue VFDA failed to deliver fish that were "available" under the contract. The jury specifically found against Nautilus on its claims that VFDA had failed to deliver fish quantities as required under the contract. *See* Section III.C. below.

**7.** Jury instructions that involve rules of law are reviewed *de novo*, but error in such instructions will not be grounds for reversal if harmless. *Aviation Assocs., Ltd. v. TEMSCO Helicopters, Inc.*, 881 P.2d 1127, 1130 n. 4 (Alaska 1994).

underdelivery, as no evidence supported the jury's decision.[8] It argues that the jury should have awarded damages as calculated in defendant's exhibit WWW, because this exhibit "was revised to reflect the VFDA's testimony and accounting."

While Nautilus may have prepared exhibit WWW in response to numerous inaccuracies in its evidence, pointed out by a VFDA witness at trial, that does not compel the conclusion that exhibit WWW is VFDA's own assessment of the damages Nautilus was due. The issue of damages remained contested in its entirety throughout the trial. The jury heard conflicting testimony regarding Nautilus's anticipated profits and the price Nautilus would have been likely to command from its customers. The alleged underdeliveries were themselves disputed, with VFDA claiming that Nautilus in fact had rejected the fish it offered. In short, the evidence regarding damages does not compel any one conclusion. The jury could have concluded that Nautilus's evidence of damages was speculative. We find no error in the jury's failure to award damages for underdelivery.

### D. Calculation Error

Nautilus argues that the jury erred in calculating the amount due VFDA under the contract, and that the actual award should have been $32,418.37, not $33,243.55. VFDA concedes this point. The award therefore should be reduced by this amount on remand.

### IV. CONCLUSION

The judgment of the superior court is AFFIRMED, except as to the calculation error in the jury award, which is REMANDED for recalculation.

---

8. A jury's verdict will be overturned if there is no evidence supporting the verdict. *Municipality of* *Anchorage v. Baugh Constr. and Eng'g Co.,* 722 P.2d 919, 927 (Alaska 1986).