William ZAVERL, Personal Representative of the Estate of Margaret M. Zaverl, Appellant,

v.

Owen Q. HANLEY, M.D., and James B. Borden, M.D., Appellees.

No. S–9312.

Supreme Court of Alaska.

Feb. 14, 2003.

Rehearing Denied March 14, 2003.

Kenneth P. Ringstad, Paskvan & Ringstad, P.C., Fairbanks, for Appellant.

Sanford M. Gibbs, Brown, Waller & Gibbs, Anchorage, for Appellee Owen Q. Hanley, M.D.

John J. Tiemessen and Jason Weiner, Clapp, Peterson & Stowers, LLC, Fairbanks, for Appellee James B. Borden, M.D.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

## OPINION

EASTAUGH, Justice.

## I. INTRODUCTION

Margaret Zaverl's estate sued her surgeon and her pulmonologist, alleging that they negligently diagnosed and failed to treat her aortobronchial condition in 1994, causing her death. The jury returned a verdict for both physicians. At trial the surgeon testified over the estate's objection about matters his lawyer had instructed him not to address at his pre-trial deposition. Because it was error to permit this testimony at trial, we remand for a determination whether this error prejudiced the estate's claims against either physician. We vacate the award of costs and attorney's fees assessed against the individual beneficiaries of the estate, Margaret Zaverl's husband and children, because they were not parties. We affirm as to all other issues the estate raises on appeal.

## II. FACTS AND PROCEEDINGS

Margaret Zaverl coughed up a significant quantity of blood on October 2, 1994.[1] She was taken to Fairbanks Memorial Hospital where Dr. Eric Stirling, an emergency medicine specialist, examined her. She reported that she had coughed up and vomited bright red blood and that she experienced shortness of breath and wheezing. Her medical history included regular cigarette smoking, a left thoracotomy for coarctation of the aorta[2] at age seventeen, and removal of an anaerobic tumor of the abdomen in early 1970. Margaret was forty-five years old in 1994.

Dr. Stirling consulted with Dr. James Borden, a surgeon. Dr. Borden performed a bronchoscopy which "showed an apparent tumor in the bronchus to the right middle lobe and right lower lobe." Dr. Borden could not remove the tumor during the bronchoscopy. The fiberoptic bronchoscope showed marked inflammation of the tracheal wall and blood clots. The right side of the bronchial tree appeared to be more inflamed than the left— a condition which Dr. Borden found to be consistent with the presence of the suspected tumor.

Dr. Borden consulted with a Fairbanks internist, Dr. Kenneth Starks. Chest X-rays revealed that infiltrates obscured the lower bases of Margaret's lungs. Dr. Borden admitted Margaret to the hospital's intensive care unit, made arrangements for a follow-up bronchoscopy, and arranged for her to see Dr. Owen Hanley, a pulmonologist, when Dr. Hanley returned to Fairbanks. Margaret underwent a variety of tests to determine the cause of her illness. Dr. Hanley saw Margaret on October 6. Dr. Hanley was unable to ascertain immediately the cause of her massive hemoptysis,[3] and he recommended another bronchoscopy. Margaret was discharged on October 8. Dr. Hanley made arrangements for a follow-up visit in ten days to perform a computerized axial tomography (CAT or CT) scan once the infiltrates had cleared from Margaret's lungs.

---

1. There may still be genuine, unresolved disputes about some of the fact propositions we discuss here and elsewhere in this opinion. Our fact recitation is intended to give factual context to the legal issues on appeal. It is not intended to foreclose the parties from litigating genuine factual disputes that are material to the issues on remand.

2. A "coarctation" is a "constriction, stricture, or stenosis." STEDMAN'S MEDICAL DICTIONARY 321 (25th ed. 1990). A "thoracotomy" is an "incision into the chest wall." *Id.* at 1594. Margaret had a left thoracotomy, an opening of the left chest cavity, for a graft repair of the coarctation of the aorta.

3. Dr. Rolf Holle, one of the estate's experts, testified that a "massive hemoptysis" occurs "when someone coughs up between two hundred and six hundred cc of blood within a period of around twenty-four hours.... [I]t's not only the volume of blood but how quickly it comes out and also the ability of the person who is doing it to clear it out of their airway tract."

When the doctors told Margaret that they were uncertain what was causing her bleeding, she asked if the bleeding could be related to her aorta repair. There was evidence that the doctors assured Margaret that the bleeding was not related to her aorta repair.

Margaret began to cough up blood again on the evening of October 9. Her family took her to Fairbanks Memorial Hospital. Margaret lost consciousness en route and died at the hospital soon after. Autopsy revealed that sections of the graft on her aorta had adhered to the pulmonary parenchyma;[4] some of the tissue had died, leaving marked accumulation of blood in the pulmonary parenchyma directly adjacent to the aortal graft. The autopsy summary concluded that this accumulation "most likely represents the origin of the patient's severe hemoptysis."[5]

Margaret's husband, William Zaverl, as personal representative of her estate, filed a superior court complaint against Drs. Borden and Hanley in October 1996. The superior court appointed an expert advisory panel at the defendants' request. The case proceeded to trial beginning mid-May 1999. The estate offered evidence that Drs. Hanley and Borden failed to consider Margaret's prior aorta repair in diagnosing her condition, but the jury returned a verdict for both physicians.

Drs. Hanley and Borden moved for awards of costs and attorney's fees against William Zaverl as personal representative of Margaret's estate and against the individual statutory beneficiaries jointly and severally. The court granted the motion and awarded Dr. Hanley costs and fees of $57,824.52 and Dr. Borden costs and fees of $67,149.40. These joint and several awards were against the estate, Margaret's spouse, and her children. The caption on the final judgment names "WILLIAM ZAVERL, Personal Representa-

tive of the Estate of Margaret M. Zaverl." But the final judgment states that it is against the estate and the individually named statutory beneficiaries.

This appeal followed. William Zaverl is the named appellant, acting as personal representative of the estate.

## III. DISCUSSION

### A. It Was an Abuse of Discretion To Permit Dr. Borden To Testify at Trial on Topics He Refused To Discuss at His Deposition.

■ The estate argues that it was an abuse of discretion to allow Dr. Borden's trial lawyer to question him at trial about topics his attorney instructed him not to discuss at his deposition. We agree,[6] and remand to the superior court to determine the effect of this error.

#### 1. Dr. Borden testified at trial about matters he refused to address at his deposition.

At Dr. Borden's pre-trial deposition, the estate's lawyer asked Dr. Borden, "Did Margaret Zaverl die because the connection between the massive hemoptysis and her history of prior aortic repair was not diagnosed?" Dr. Borden's attorney objected and instructed Dr. Borden not to answer:

I object to the form of the question. He's not an expert in that area.... He's not going to testify as an expert in that area, and I won't allow him to testify on this—on the speculation of something nobody will ever know and he's not a cardiovascular surgeon, cardiac thoracic surgeon, so he's not going to answer that question.

---

4. "Parenchyma" designates "[t]he distinguishing or specific cells of a gland or organ, contained in and supported by the connective tissue framework, or stroma." STEDMAN'S MEDICAL DICTIONARY 1139 (25th ed.1990). "Pulmonary parenchyma" refers to the parenchyma of the lungs.

5. The autopsy summary noted that "[m]assive hemoptysis occurring several years after report of aortic coarctation has been previously reported," and cited to a medical journal article published in 1994.

6. We review evidentiary rulings and rulings on the adequacy of discovery for abuse of discretion. *Nautilus Marine Enters. v. Valdez Fisheries Dev. Ass'n*, 943 P.2d 1201, 1204 n. 3 (Alaska 1997); *Cockerham v. State*, 933 P.2d 537, 539 n. 9 (Alaska 1997). "We will reverse a trial court's evidentiary ruling only when we are left with a definite and firm conviction that the trial court erred in its decision." *Walden v. Dep't of Transp.*, 27 P.3d 297, 301 (Alaska 2001).

When the estate's attorney asked Dr. Borden what treatment he would have provided if the aortobronchial fistula[7] had been diagnosed, Dr. Borden's attorney stated:

> I'm going to instruct him not to answer. He's not going to speculate on something which he did not do.... He's not an expert. I'm not going to offer him as an expert in the area of cardiovascular treatment and handling of aortic breakdown, I mean breakdowns of coarctation repairs of the aorta.

Dr. Borden did not answer these questions at his deposition.

At trial, near the end of Dr. Borden's direct testimony, his trial attorney asked Dr. Borden if he had "a fairly good understanding of what's necessary to repair ... an aortobronchial fistula such as Margaret Zaverl had." The estate's attorney objected. He argued that when he asked Dr. Borden the same question at the deposition, Dr. Borden's deposition attorney instructed Dr. Borden not to answer and not to speculate about something he did not do and something that did not occur. When the trial court stated that a motion to compel would have been the way to deal with the attorney's instruction, the estate's attorney indicated that he had understood counsel's statement at the deposition to mean that Dr. Borden would not be offered as an expert on these topics.

The trial court overruled the estate's objections. The court reasoned that Dr. Bor-
den was a general surgeon, not a cardiovascular surgeon who does such repairs or who is an expert in repairing such conditions. The court stated that Dr. Borden's knowledge in 1994 "is an important issue" and "to the extent he's a defendant in this case, as to the standard of care he gave, it appears to the court relevant and admissible for those issues to be discussed with him, by both sides." The court also noted that the estate would have an opportunity to cross-examine.

Dr. Borden then testified that he did have "a reasonably good understanding" of aortobronchial fistulae. He proceeded to testify at some length about particular nuances of diagnosing and treating this condition. Dr. Borden testified that he wished he had thought of "this particular kind of fistula," even though "these other smart guys wouldn't have thought about it." Nonetheless, he concluded that his treatment of Margaret, including his failure to detect the fistula which may have caused her hemoptysis, did not fall below the applicable standard of care.

### 2. Dr. Borden should not have been permitted to testify to matters he refused to discuss at his deposition.

■ The estate argues on appeal that it was error to permit Dr. Borden to testify at trial about matters he was instructed not to discuss at his deposition.[8] The estate asserts

---

7. A fistula is "[a]n abnormal passage from a hollow organ to the surface, or from one organ to another." Stedman's Medical Dictionary 589 (25th ed.1990). An aortobronchial fistula is an abnormal passage between the aorta and the lungs.

8. We asked the parties to submit supplemental briefs identifying the testimony offered over the estate's objection. The estate asserts that the objection, if sustained, would have excluded Dr. Borden's testimony which the estate describes as follows:

> (1) that he has a "reasonably good understanding" of aortobronchial fistulas (Tr. 1742);
> (2) of what the "innuendos" of the aortobronchial fistulas were, including the aortobronchial fistula in this particular case (Tr. 1742–44);
> (3) of what "you would be faced with" "if you went in there [where Margaret Zaverl's fistula was located] surgically" (Tr. 1743–44); (4) of what a surgeon who was operating in a case

like Margaret Zaverl's would do "once you got inside the chest" "to attempt to identify whether or not there is a fistula" and that "in this particular case" "when you separated the lung off the aorta at that point you'd have, you could have a pretty good bleed" (Tr. 1743–44); (5) that if Margaret Zaverl had survived the second bleed and had a second CAT scan, the second bleed "almost certainly would have showed up" (Tr.1945–6); (6) of how fistulas like Margaret Zaverl's fistula are ordinarily diagnosed and "the way you make the diagnosis ordinarily of this fistula" is with a CT scan:
> ... that's the way [CT scan] you make the diagnosis ordinarily of this fistula ... not only the pseudoaneurysm at the anastomosis but also congestion or blood collection in the fistula of the lining adjacent to the aorta. (Tr. 1746); (7) that fistulas "virtually always" have an abnormal CT scan and are shown on a CT scan (Tr. 1747); (8) that "virtually all" hemoptysis from these fistulas have abnormal

that discovery was thwarted when Dr. Borden's attorney instructed him at his deposition not to respond to questions concerning detection and repair of aortobronchial fistulae, stated that he would not offer him as an expert on the detection and repair of aortobronchial fistulae, and then questioned him on precisely those areas at trial without giving advance notice of his changed intentions. The estate relies on *Yukon Equipment, Inc. v. Gordon,*[9] which upheld a trial court's exclusion of testimony not described in interrogatory answers.

Dr. Borden responds that he was not qualified to give testimony on aortobronchial fistulae when the estate took his deposition in August 1997, but was qualified to do so when he testified at trial in May 1999. Dr. Borden distinguishes *Yukon Equipment* on the theory that he did not fail to disclose information, as the witness did in *Yukon Equipment.* Dr. Borden asserts that he simply did not have the information to answer at his deposition but did at trial.

We conclude that the estate was affirmatively led to believe that Dr. Borden would not express opinions at trial on matters beyond the expertise of a general surgeon, and more specifically, that Dr. Borden would not testify about the treatment of aortobronchial fistulae. Dr. Borden never disclosed his intention to testify at trial about what he had learned since his deposition, about surgery a general surgeon would not perform, or in reliance on expertise he acquired after his lawyer disclaimed that expertise at Dr. Borden's deposition.[10] Assuming that Dr. Borden's inconsistent positions were the result of an innocent misstep not meant to unfairly

---

CT scans that will direct you to the diagnosis, [that] 90 percent of the people with massive hemoptysis from this type of fistula die before they get to surgery and not only that his care did not fall below the standard of care, but also that the way Margaret Zaverl was managed was not below the standard of care:

Q .... do you believe that your care fell below the standard of care?

A. No, I wouldn't say it falls below the standard of care.... [M]ost of these people ... 90% of the people with massive ... hemoptysis from these fistuli, die before they ever get to surgery.... [O]ver 50% of the diagnoses are made at autopsy ... [V]irtually all of them that have CAT scans ... have an abnormal CT that'll direct you to the diagnosis.... I can't see where ... the way she was managed would be below the standard of care.

(Tr. 1754–55) (the way Margaret Zaverl was managed includes the treatment and care provided by defendant Hanley); (9) that a history of [coarct] repair didn't send up a red flag (Tr. 1747); and (10) during examination by Hanley's counsel, Borden testified:

Q .... when you were talking about Exhibit HQ, you talked about distal with a subclavian. What do we mean by ...

A. Downstream. Often we'll take proximal and distal when we're talking about a graft because, you know, most of the time when you have a graft fistula, it'll be from the proximal anastomosis, so if there was a tube graft going on here, towards the heart or towards the center of the body would be proximal and then the distal into the graft would be down stream, so again, distal, to the subclavian artery would be down stream.

(Tr. 1755)

Dr. Borden and Dr. Hanley have not claimed that the estate has misdescribed the Borden testimony that would have been excluded had the court upheld the estate's objection.

**9.** 660 P.2d 428, 432 (Alaska 1983) (also holding that trial court properly excluded expert witness not included in pretrial witness list), *overruled on other grounds by Williford v. L.J. Carr Invs., Inc.,* 783 P.2d 235, 237 n. 5 (Alaska 1989). The estate also relies on *McCubbins v. State, Department of Natural Resources,* 984 P.2d 501, 507–08 (Alaska 1999) (holding that trial court did not abuse its discretion by excluding evidence that should have been disclosed in interrogatory responses); *City of Valdez v. Salomon,* 637 P.2d 298, 299 (Alaska 1981) (holding that trial court abused its discretion by refusing to set aside default judgment issued for plaintiff where plaintiff's attorney did not respond to defendant's pre-judgment request for information); and *Aysseh v. Lawn,* 186 N.J.Super. 218, 452 A.2d 213, 221–22 (1982) (barring witness from testifying to matters he refused to speak to at deposition on ground of attorney-client privilege).

**10.** Dr. Borden's April 1999 responses to requests for admissions concerning the aorta repair again indicated, about five weeks before trial was to begin, that he was only a "fact witness." His pretrial memorandum submitted ten days before trial stated: "Dr. Borden does perform some vascular and thoracic surgery.... Dr. Borden has never performed aortic surgery, *nor is he familiar with the procedures involved.*" (Emphasis added.) These assertions would have given the estate no reason to anticipate that at trial Dr. Borden would be asked the disputed questions or would talk about topics foreclosed at his deposition.

disadvantage the estate,[11] we nonetheless agree with the estate that the purpose of discovery was thwarted. The opportunity to cross-examine at trial was no substitute for pretrial discovery in this case.[12]

■ Dr. Borden asserts that the estate should have raised any objection to the deposition by filing a motion to compel. But no pretrial motion to compel was necessary to preserve the estate's trial objection that Dr. Borden could not testify about things he refused to discuss at his deposition. The estate was not obliged to anticipate that Dr. Borden might claim at trial that he now knew more than he did when he treated Margaret Zaverl or when he was deposed. Only if the estate had been given reason to think Dr. Borden intended to address the foreclosed topics at trial would it have been required to file a motion to compel. So far as we can determine, Dr. Borden apparently did not reveal that intention until his trial lawyer began asking him the disputed questions at trial. Having followed his lawyer's deposition instruction not to testify about certain topics, Dr. Borden had to live with that decision absent fair notice to the estate.

■ The issue is not whether Dr. Borden was eligible to express any opinions, but whether he could do so on topics he refused to discuss at his deposition.[13] In *Miller v. Phillips*, a medical malpractice case, we thought it significant that the Millers had received Dr. Newton's affidavit setting ·out the substance of his opinions "well before trial." [14] Here, the estate had no advance notice that Dr. Borden would offer the disputed testimony or rely on expertise he had disclaimed at his deposition. There is no reason in this situation to permit such undisclosed opinions.

■ Under the circumstances, it was error to permit Dr. Borden to testify at trial about relevant topics he declined to discuss at his deposition.[15]

11. The estate asserts that Dr. Borden engaged in "impermissible gamesmanship." Dr. Borden argues that he did not engage in "gamesmanship," and we note that different lawyers represented Dr. Borden at his deposition and at trial. We also observe, however, that the facts may not exactly match Dr. Borden's appellate explanation for his change in position. He argues that he knew very little about such matters at his deposition, but that he "later became an expert on the subject," and that the trial court "correctly ruled" that Dr. Borden knew more at the time of trial in 1999 than when he was deposed in 1997. But the estate contends that the Borden trial testimony Dr. Borden cites to support those propositions simply established that he knew more in 1999 than he knew in *1994* when he treated Margaret Zaverl. At his deposition, Dr. Borden testified that he had reviewed "quite a pile" of medical literature articles. This testimony implies that Dr. Borden might have learned enough even before his 1997 deposition to answer the questions his lawyer told him not to answer. If so, the facts would not support the trial court's assumption that Dr. Borden's newfound expertise post-dated his deposition. And if so, counsel's deposition instruction was unwarranted and Dr. Borden's refusal to answer potentially would have justified entry of an order under Civil Rule 37 sufficient to remedy any prejudice the refusal caused.

12. See *W.R. Grace & Co.-Conn. v. Zotos Int'l, Inc.*, No. 98–CV–838S(F), 2000 WL 1843258, at *5 (W.D.N.Y. Nov.2, 2000); *Rossman v. Rossman*, 47 Ohio App.2d 103, 352 N.E.2d 149, 153 (1975).

13. As a treating physician Dr. Borden was eligible to express expert opinions even though he was not listed as an expert witness on defendants' pretrial disclosure lists. *Miller v. Phillips*, 959 P.2d 1247, 1250 (Alaska 1998).

14. 959 P.2d 1247, 1251 (Alaska 1998).

15. Given this conclusion, we do not need to consider whether, as the estate alternatively asserts, the failure to give notice that Dr. Borden would be asked about these topics at trial violated the duty to supplement expert deposition testimony under Alaska Civil Rule 26(e), or whether such a violation required the trial court to limit Dr. Borden's trial testimony.

The estate's reply brief discusses the issue in terms usually applied to the doctrine of estoppel, although its briefs do not explicitly invoke that doctrine by name. The doctrine of quasi-estoppel "precludes a party from taking a position inconsistent with one ... previously taken where circumstances render assertion of the second position unconscionable." *Jamison v. Consol. Util.*, 576 P.2d 97, 102 (Alaska 1978); *see also John's Heating Serv. v. Lamb*, 46 P.3d 1024, 1040–41 (Alaska 2002) (holding quasi-estoppel not applicable when party taking inconsistent position did not gain anything from original position, third party did not sufficiently rely on either position, and first position was not based on full knowledge of facts). We do not consider whether Dr. Borden's disputed trial testimony should have been estopped, because the estate raised the estoppel issue for the first time in its reply brief.

**3. We remand to the trial court to determine whether the error was harmless.**

The circumstances that convinced the trial court that the disputed evidence was relevant and not redundant or speculative preclude us from saying as a matter of law that the error of allowing the testimony was harmless. Dr. Borden's testimony was important evidence bearing on liability. It was offered by a treating physician who was also a defendant and whose credibility and candor may have been critical to the jury trying to decide whether he breached the applicable standard of care. He described the quality of his care favorably, apparently applying the knowledge he acquired after his deposition. This permitted him to address the medical issues in a light most favorable to himself and to increase his stature as a witness.

The effect of this error is not clear. We consequently asked the parties for supplemental briefing on how the testimony affected the case against each defendant physician.

The estate argues that the error was not harmless because the jury could have relied on Dr. Borden's testimony to decide that Dr. Borden's treatment was not negligent. The estate also contends that because Dr. Borden testified that Margaret Zaverl's overall treatment was not substandard, the jury could have relied on Dr. Borden's testimony to absolve Dr. Hanley of liability.

Dr. Borden's supplemental response is two-fold: the jury was not misled, because he admitted that he did not have knowledge of these fistulae when he treated Margaret Zaverl; and his testimony about the standard of care only "echoed" the testimony of his expert witness, Dr. Joseph Stapleton Coselli. Dr. Borden implies that because the estate's attorney was prepared to cross-examine Dr. Coselli, the estate's attorney also must have been prepared to cross-examine Dr. Borden. Further, Dr. Borden asserts that the jury could have found and was encouraged to find an absence of negligence in reliance on Dr. Coselli's testimony, without considering Dr. Borden's testimony on the standard of care.

Dr. Borden also contends that his own testimony was relevant because he was the only witness who could discuss what he knew when he treated Margaret Zaverl and that his testimony was not speculative because he spoke from his own knowledge.

He also argues that the estate was not prejudiced by the testimony because the estate's lawyer was given wide latitude to examine Dr. Borden on exactly when he acquired his knowledge and could easily emphasize to the jury that Dr. Borden did not have this knowledge when he treated Margaret Zaverl.

Finally, Dr. Borden concludes that the testimony only affected himself, not Dr. Hanley, and that even if the testimony had been excluded, there was more than enough evidence regarding the relevant standard of care to support the jury's verdict.

Dr. Hanley simply argues that he was not affected by Dr. Borden's testimony because the jury was instructed that Dr. Hanley was to be held to a distinct standard of care and because he had his own experts to establish that standard. He consequently asserts that he did not rely on Dr. Borden's testimony at all.

We cannot say, even after the supplemental briefing, that the error was harmless. We therefore remand to the trial court to determine the effect of admitting the disputed testimony. Having heard the evidence admitted at trial, the trial court is in the best position to consider the effect of Dr. Borden's disputed trial opinions in the context of the other evidence, those deposition passages submitted to the jury, the opinions of other experts, and other trial events, including the parties' arguments to the jury. Remand will give the parties the best opportunity to explore whether the error prejudiced the estate's claims against either defendant or was harmless. This may be a fact-intensive inquiry that requires more flexibility than the appellate forum permits. It may depend on the tactics the parties employed at trial.

See *Danco Exploration, Inc. v. State, Dep't of Natural Res.*, 924 P.2d 432, 434–35 n. 1 (Alaska 1996) ("[N]ew arguments presented for the first time in reply briefs are considered waived.").

## B. The Court Did Not Err in Refusing To Admit Evidence and Instructing on the Standard of Care for Medical Specialists.

■■■ The estate argues that errors prevented the jury from holding Dr. Borden to the standard of care of a specialist in thoracic and vascular surgery, rather than the lower standard of care of a general surgeon. Thus, it asserts that it was error not to admit into evidence medical directories and Yellow Pages advertisements listing Dr. Borden as a vascular and thoracic surgeon. It further asserts that the jury should have been instructed that Dr. Borden held himself out as a specialist in thoracic and vascular surgery and that a specialist's failure to use the care and skill practiced in that specialty is negligence.[16]

Dr. Borden responds that he is only a general surgeon and that he testified that he was board certified only in general surgery. He argues that he has only had some experience in thoracic and vascular surgery and that he should not be held to the standard of care of a specialist because he never represented to Margaret Zaverl that he was a specialist in those areas. He argues that his training, knowledge, and skill did not rise to the level of a specialist and that it would have been error to give the estate's proposed jury instruction or to admit the advertisements. He argues that his testimony on his experiences in those areas was sufficient to inform the jury of the standard by which he should be judged. Because the estate was allowed to cross-examine Dr. Borden at trial about his experiences and his listings and advertisements, Dr. Borden argues that the trial court did not err in determining that admitting the listings and advertisements into evidence would be irrelevant and cumulative.[17]

■■■ Physicians who hold themselves out to the public as having specialized knowledge or skill must be held to the standard of care of specialists with those enhanced qualifications.[18] It does not matter whether the physician led any specific patient to have an actual expectation that the physician would exercise a greater level of skill, so long as the physician has taken "affirmative steps" to present himself or herself to the public as a specialist.[19]

But we discern no reversible error with respect to the evidence or the instructions. Dr. Borden defended on the theory that regardless of specialty, skill, training, or place of practice, no physician—even a specialist in

16. We review evidentiary rulings for abuse of discretion. *Nautilus Marine Enters. v. Valdez Fisheries Dev. Ass'n*, 943 P.2d 1201, 1204 n. 3 (Alaska 1997). "A challenge to jury instructions presents a question of law which is reviewed independently. A legally erroneous instruction will lead to reversal only if it prejudices a party; prejudice exists unless one can 'say with fair assurance that the result was not affected by [the] error.'" *Lynden Inc. v. Walker*, 30 P.3d 609, 612 (Alaska 2001) (quoting *Barrett v. Era Aviation, Inc.*, 996 P.2d 101, 105 (Alaska 2000) (footnote omitted)).

17. Given the result we reach on this issue, it is not necessary here to discuss Dr. Borden's assertion based on *Priest v. Lindig*, 583 P.2d 173 (Alaska 1978), that he should not be held to a higher standard because he was not actually trained in thoracic or vascular surgery and had no actual knowledge of or skill in those areas. But in the event the error discussed in Part III.A. requires retrial, we believe that the advertisements and other evidence, including Dr. Borden's own testimony, would permit an inference, as Zaverl argues, that Dr. Borden "possessed ... a greater degree of skill, knowledge or intelligence than other physicians practicing in the same specialty in similar communities." *Priest*, 583 P.2d at 177 (quoting *Poulin v. Zartman*, 542 P.2d 251, 269 n. 42 (Alaska 1975)).

18. *Ayers v. Parry*, 192 F.2d 181, 184 (3d Cir. 1951); *cf. Buckner v. Wheeldon*, 225 N.C. 62, 33 S.E.2d 480, 482 (1945) (holding that specialists will be held to higher standard of care); *see* 61 AM JUR.2D *Physicians, Surgeons, and Other Healers* § 209 (2002) (collecting cases and stating general rule that physicians who hold themselves out as specialists will be held to standard of care commensurate with their enhanced qualifications).

19. 61 AM.JUR.2D *Physicians, Surgeons, and Other Healers* § 209 (2002); *see Rule v. Cheeseman*, 181 Kan. 957, 317 P.2d 472, 478 (1957); *Reikes v. Martin*, 471 So.2d 385, 389 (Miss.1985) (holding jury instruction erroneous because it referred to standard of care particular patient might reasonably expect as opposed to objective standard physician owed to patient); *but cf. McBride v. United States*, 462 F.2d 72, 74 (9th Cir.1972) (holding that standard of care does not vary according to doctor's knowledge or education unless doctor represents to patient that physician possesses special skill).

cardiovascular surgery—would have correctly diagnosed and treated Margaret Zaverl's condition. Thus he relied on the opinions of Dr. Coselli, a prominent cardiovascular surgeon who practiced at a teaching hospital in Houston, Texas.[20] Dr. Borden likewise relied on his own testimony, discussed above in Part III.A, expressing the same opinion based on his post-treatment research. Dr. Borden's closing argument did not attempt to defend on a theory that a general surgeon was not required to do what specialists could do.

We therefore conclude that it was not an abuse of discretion to exclude the listings and advertisements.[21] We also conclude that, given the nature of Dr. Borden's defense, it was not error to reject the proposed instruction. The proposed instruction correctly stated the law.[22] But it was unnecessary because, as seen above, Dr. Borden's defense did not rest on the proposition that, as a general surgeon, he should be held to a lower standard of care than thoracic, vascular, or cardiovascular surgeons.

Of course, should the trial court's resolution on remand of the Borden testimony issue require retrial, the case may be in a different posture, requiring the trial court to revisit these evidentiary and instructional issues.

## C. The Court Did Not Err in Refusing To Strike the Expert Advisory Panel.

The estate argues that the members of the court-appointed three-member expert advisory panel were biased because they had social relationships with the defendants or had prior knowledge of the case or opinions about it. It consequently argues that rule, statute, or due process required the trial court to disqualify each member. It also argues that the panel violated the procedural requirements of AS 09.55.536 in pro-

---

20. Dr. Coselli testified that a thoracic surgeon might go through a whole career without seeing an aortobronchial fistula. He asserted that only fifty percent of aortobronchial fistulae are properly diagnosed and about half of the people who need surgery as a result of an aortobronchial fistula die before the operation. He testified that the result would have been the same even had Margaret been cared for at his hospital in Houston. He said, "I don't think with the information ... that they had at hand, if I was in the same situation ... I don't think I'd make the diagnosis.... We'd let her go home, would not have changed the course of her care at all."

21. We also note that Dr. Borden described for the jury the substance of the advertisements and his listing of his speciality as "Vascular Surgery, Thoracic Surgery" in the State Medical Association Directory.

22. Proposed Instruction No. 31 stated in part:
It is the duty of a physician who holds himself or herself out as a specialist in a particular field of medical, surgical, or other healing science, to have the knowledge and skill ordinarily possessed, and to use the care and skill ordinarily used, by reputable specialists practicing in the same field or speciality.
A failure to fulfill such duty is negligence.
In this case, defendant Borden holds himself out as a specialist in the fields of general, vascular, and thoracic surgery.
Defendant Hanley holds himself out as a specialist in the field of pulmonary disease and internal medicine.
The court's Instruction No. 16 provided:

In a malpractice action based on the negligence or willful misconduct of a health care provider, the plaintiff has the burden of proving by a preponderance of the evidence:
1. the degree of knowledge or skill possessed or the degree of care ordinarily exercised under the circumstances, at the time of the act complained of, by health care providers in the field or specialty in which the defendant is practicing;
2. that the defendants either lacked this degree of knowledge or skill or failed to exercise this degree of care; and
3. that as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
The court's Instruction No. 20 provided in part:
[A] pulmonologist and/or surgeon is negligent if the physician:
1. lacked the degree of knowledge or skill ordinarily possessed by a reputable physician specializing in his field;
2. failed to exercise the degree of care ordinarily exercised under the circumstances by a reputable physician in his specialty. Failure to exercise that care may be the result of an act or failure to act.
However, the mere fact that the plaintiff was harmed does not mean the defendant or defendants were negligent.

ducing its report.[23]

The estate sued Drs. Hanley and Borden in 1996. The defendants asked the court to appoint an expert advisory panel.[24] Drs. Steven Kilkenny, Tim Coalwell, and Beth Baker were ultimately nominated. Dr. Borden notified the court and plaintiff in June 1997 that the law firm representing him was also representing Dr. Kilkenny in an unrelated matter. Dr. Baker disclosed in June 1997 that she may have previously discussed the case because she thought it had been "presented" at a 1994 meeting she attended. The estate did not object to these possible conflicts of interest, and in August 1997 the trial court entered an order appointing these three physicians to the panel. In June 1998 Dr. Borden notified the court and plaintiff that the law firm representing him was also representing Dr. Coalwell in an unrelated matter.

The panel never met in person, but the panelists each issued a report on November 20, 1997. Dr. Baker summarized the three reports. In February 1999 the estate moved to strike the entire panel and its report, alleging that all three panelists were biased and had failed to confer in person or submit a single report, in alleged violation of the requirements of AS 09.55.536. The trial court denied these motions in March 1999.

The estate argues on appeal that it was error not to order the panel and its reports struck. Drs. Borden and Hanley respond by contending, among other things, that the estate waived any challenge by waiting over a year to object to the panel.

We agree with Drs. Borden and Hanley that the objections to the panel and its opinions were raised too late and were therefore waived.[25] The estate knew no later than June 1997 of possible conflicts as to two members and no later than June 1998 of a possible conflict as to the third member. Nonetheless, the estate did not take the depositions of panelists until early February 1999, about three months before trial was to begin. The estate filed its objections to the panel and its findings about eighteen months after the panel was appointed, about fourteen months after it issued its report, and about three months before trial. By then it was impossible to appoint a new panel and the delay potentially would have prejudiced the defendants. This likely would have meant submitting the case to the jury without any advisory report.[26]

Nothing about the grounds for objections under Alaska Civil Rule 72.1 or AS 09.55.536 precludes their rejection as untimely. And due process is not inconsistent with requiring litigants to raise timely procedural and substantive objections.

Given the patent untimeliness of the estate's motions to strike the panel and its reports, the court did not err by denying them. We consequently do not need to decide whether the estate's motions were meritorious.

### D. The Court Did Not Err by Allowing Dr. Halvorsen To Testify About the Standard of Care.

The trial court accepted Dr. Robert Halvorsen as an expert in diagnostic radiolo-

---

**23.** We review the denial of the motion to strike the panel and its report for abuse of discretion. We apply our independent judgment to issues of statutory interpretation, such as whether the trial court properly construed and fulfilled its statutory duty to appoint an expert advisory panel under AS 09.55.536. *Taylor v. Johnston*, 985 P.2d 460, 463 (Alaska 1999).

**24.** AS 09.55.536(a) requires the superior court to appoint a three-member expert advisory panel in medical malpractice cases unless the court deems an expert advisory opinion unnecessary. The panel may hear testimony and may meet in camera. AS 09.55.536(b). The panel shall make a written report signed by each panel member unless a member chooses to submit a concurring or dissenting report. AS 09.55.536(c)-(d).

**25.** The superior court denied the motion to strike, apparently on the merits, rather than on grounds of untimeliness. We can affirm on alternative grounds apparent from the record. *Moore v. State*, 553 P.2d 8, 20–21 (Alaska 1976) (holding that supreme court may affirm judgment on alternative grounds).

**26.** Per a January 1998 pretrial order, expert witnesses were to be listed by March 1, 1999, discovery was to close April 9, 1999, and trial was to begin May 10, 1999. An April 15, 1999 amended pretrial order extended discovery to April 21 and set May 17 as the first day of trial.

gy. According to the estate, Dr. Halvorsen stated in his deposition that he was not capable of testifying to the standard of care of thoracic surgeons, general surgeons, or pulmonologists. The estate argues that it was error to permit Dr. Halvorsen to testify at trial that the care provided by Drs. Hanley and Borden "was well within acceptable medical standards." [27]

Dr. Hanley argues that Dr. Halvorsen did not testify to the general standard of care provided by the defendants, as the estate contends. Dr. Hanley asserts that Dr. Halvorsen instead testified to the standard of care from the perspective of a radiologist.

Dr. Halvorsen testified:

> I believe the care provided of Mrs. Zaverl by Drs. Hanley, Borden and Starks as well as the care provided by Fairbanks Memorial Hospital, was well within acceptable medical standards. The physicians used the appropriate radiographic modalities as well as bronchoscopy to exclude the diagnosable cause of hemoptysis. Unfortunately, she died of a rare condition that could not be diagnosed with the facilities available to those physicians. Think that there is information on these. The chest x-ray and on the CT that would have guided these physicians at the time they were involved in the care of this patient in 1994 away from a diagnosis that actually turned out to be a correct diagnosis that was proved on autopsy.

According to Dr. Hanley, the context of Dr. Halvorsen's remarks demonstrates that Dr. Halvorsen was only testifying about the standard of care for diagnosis based on radiological techniques. The estate's reply brief does not respond to these arguments.

The estate has not shown that the trial court abused its discretion by allowing Dr. Halvorsen to discuss the standard of care applicable when a physician uses radiological tools to diagnose a patient. Dr. Halvorsen had the expertise to discuss this subject and was properly admitted as an expert to express such an opinion. The estate had a fair opportunity on cross-examination to clarify the scope of Dr. Halvorsen's expertise and testimony. We conclude that the trial court did not abuse its discretion by permitting Dr. Halvorsen to express this opinion.

**E. The Court Did Not Err by Refusing To Impose a Presumption of Negligence Based on the Failure To Prepare a Timely Discharge Summary.**

▆▆▆▆▆ Margaret Zaverl's discharge summary was prepared forty-eight days after her discharge; the estate alleges that this delay violated 7 Alaska Administrative Code (AAC) 12.770(e), which requires that a discharge summary be prepared within fifteen days of discharge and be signed by the attending physician.[28] The estate asserts that the delay hindered its ability to present its case, and that the trial court erred by failing to impose a presumption of negligence and causation.[29] It also argues that a violation of this regulation and an equivalent hospital policy is relevant, and that the trial court erred in preventing the estate from examining Dr. Borden about discharge summary procedures.[30] It does not explain how that ruling prejudiced the trial of its claims.

Under the circumstances of this case, the court did not err by declining to impose a presumption of fault or causation. In *Sweet v. Sisters of Providence in Washington*, we held that a regulatory breach regarding hospital records could give rise to a presumption

---

27. We apply the abuse of discretion standard in reviewing rulings permitting retained experts to express particular opinions. *Lynden Inc. v. Walker*, 30 P.3d 609, 612 (Alaska 2001).

28. 7 AAC 12.770(e) provides in pertinent part: "A record must be completed within 15 days of discharge and authenticated or signed by the attending physician or dentist."

29. Whether a violation of law gives rise to a legal presumption is a question of law which we review de novo. *Himschoot v. Shanley*, 908 P.2d

1035, 1041 n. 4 (Alaska 1996) (stating that whether statutory presumption of compensability applies is question of law); *Langdon v. Champion*, 745 P.2d 1371, 1372 n. 2 (Alaska 1987) (stating that questions of law are reviewed de novo).

30. Evidentiary rulings are reviewed for an abuse of discretion. *Nautilus Marine Enters. v. Valdez Fisheries Dev. Ass'n*, 943 P.2d 1201, 1204 n. 3 (Alaska 1997).

of negligence.[31] A presumption of negligence is appropriate when the court is convinced that "the absence of the records hinders [the plaintiff's] ability to establish a prima facie case"[32] and that "the essential medical records are missing through the negligence or fault of the adverse party."[33] But there the records were entirely absent, not merely late-prepared.[34] Here, by contrast, the discharge summary was ultimately prepared, and no information was missing or withheld. And given that the diagnosis memorialized in the discharge summary was incorrect, it is apparent that Dr. Borden did not use the extra time to improve his position in event of litigation. More importantly, Sweet made out a specific showing of prejudice.[35] In this case, however, the estate advances no plausible theory demonstrating that the delay prejudiced its case. It has not explained what information it expected to find in the discharge summary that is not there, nor has it directed us to evidence that the delay impaired the plaintiff's experts' analyses.[36]

 Accordingly, we hold the trial court did not err in failing to assign a presumption of negligence for failure to prepare a timely discharge summary.[37]

The estate's companion argument—that it should have been permitted to inquire about the delay and whether the delay violated state law and hospital procedures—is equally unpersuasive. The estate has not shown

what evidence might have been elicited or how it might have altered the verdict.

**F. Costs and Fees Awards Are Not Allowable Against Non–Party Statutory Beneficiaries in a Wrongful Death Action.**

The trial court awarded Drs. Borden and Hanley attorney's fees and costs totaling $124,973.92. Reasoning that the statutory beneficiaries in wrongful death actions are the actual "parties represented" within the meaning of AS 09.60.040, the court ruled that William Zaverl, individually and as a statutory beneficiary, and the three Zaverl children, individually and as statutory beneficiaries, would be personally liable for these costs and fees.[38] It concluded that the beneficiaries should be liable for costs and fees because the representative of the estate is only a nominal party and the estate is not a party at all. The court entered judgment totaling $124,973.92 in favor of Drs. Borden and Hanley.

Because the children were not named parties to the lawsuit and did not personally appear in the lawsuit and William Zaverl appeared only in his representative capacity, Zaverl argues that it was error to interpret AS 09.60.040 to allow recovery of costs and attorney's fees against him and the three children.[39]

---

**31.** *Sweet v. Sisters of Providence in Washington,* 895 P.2d 484, 490–92 (Alaska 1995).

**32.** *Id.* at 491.

**33.** *Id.*

**34.** *Id.* at 487–88, 490.

**35.** *Id.* at 491.

**36.** Dr. Hanley argues that 7 AAC 12.770(e) imposes a duty on hospitals, not individual physicians. Because there was no error in refusing to impose a presumption here, we do not have to decide whether Dr. Hanley's reading of the regulation is correct.

**37.** We further agree with Dr. Hanley that any possible error was harmless. Presumptions of fault are rebuttable, and the defendants offered sufficient evidence—particularly the testimony of Dr. Coselli—to rebut any presumption arising out

of the delay in preparing the discharge summary. To determine whether an error merits reversal, this court asks whether it probably affected the outcome of the trial. *See Wilson v. State,* 669 P.2d 1292, 1298 (Alaska 1983). Given the defense evidence, it is not likely the outcome of the trial would have changed had a rebuttable presumption of negligence been imposed.

**38.** AS 09.60.040 provides:

In actions in which an executor, administrator, trustee of an express trust, or a person authorized to represent a party is a party, costs may be allowed as in other cases. However, when costs are allowed against that party, they are chargeable solely upon the estate, fund, or party represented unless the court orders the costs to be paid by that party personally for mismanagement or bad faith in the conduct of the action.

**39.** This argument raises a question of law: the meaning of the controlling statute. We review

Drs. Borden and Hanley argue that the surviving spouse and children in a wrongful death action are liable for attorney's fees and costs under AS 09.55.580 [40] and AS 09.60.040. They rely on *In re Soldotna Air Crash Litigation,* in which we reiterated that although estate representatives are nominal parties in wrongful death actions, a wrongful death action is "the [beneficiaries'] cause of action." [41]

Alaska Statute 09.60.040 cannot reasonably be read to permit recovery of attorney's fees and costs against the statutory beneficiaries in this case because they did not appear and did not make claims in their personal capacities. *Soldotna* is distinguishable. We were concerned there with whether a prevailing defendant could recover costs and attorney's fees under AS 09.60.040 against the non-prevailing plaintiff in a wrongful death action.[42] We held that the prevailing defendant could recover its award from the fund created by the plaintiffs' recovery from the other defendants.[43] We left for another day the question whether a prevailing defendant could recover such an award from the statutory beneficiaries in the absence of a fund.[44] We now address that question and answer it in the negative.

 The only party plaintiff in this case was William Zaverl, and he appeared only in his representative capacity and not in any personal capacity. We hold that, although the statutory beneficiaries not named in a wrongful death lawsuit are the beneficiaries of any recovery, statutory beneficiaries who are not parties to the wrongful death lawsuit in their personal capacities are not parties for the purpose of responding to awards of costs and attorney's fees.[45] Accordingly, we vacate the trial court's award of costs and attorney's fees against the estate's statutory beneficiaries.

## IV. CONCLUSION

We REMAND to the trial court to determine whether the error of allowing Dr. Borden to testify at trial about topics he refused to discuss at his deposition prejudiced the estate's claims against either defendant. We also VACATE the joint and several award of costs and attorney's fees against the estate's statutory beneficiaries. We AFFIRM as to all other issues.

interpretations of statutes de novo, and adopt the rule of law most persuasive in light of precedent, reason, and policy. *Boone v. Gipson,* 920 P.2d 746, 748 (Alaska 1996).

**40.** AS 09.55.580 provides in pertinent part:

> (a) Except as provided under (f) of this section, when the death of a person is caused by the wrongful act or omission of another, the personal representatives of the former may maintain an action therefor against the latter, if the former might have maintained an action, had the person lived, against latter for an injury done by the same act or omission.... The amount recovered, if any, shall be exclusively for the benefit of the decedent's spouse and children when the decedent is survived by a spouse or children, or other dependents.

**41.** 835 P.2d 1215, 1220 (Alaska 1992) (quoting *Haakanson v. Wakefield Seafoods, Inc.,* 600 P.2d 1087, 1090 n. 4 (Alaska 1979)).

**42.** *Id.* at 1221–23.

**43.** *Id.* at 1222–23.

**44.** *Id.* at 1223 n. 11.

**45.** The relationship of statutory beneficiaries to the personal representative is analogous to that of the beneficiaries of an estate or trust to an executor or trustee. Estate and trust beneficiaries are ordinarily not considered parties to an action brought by an executor or trustee, nor are they personally responsible for costs and fees if the action proves to be unsuccessful. *See* 97 C.J.S. *Wills* § 1972 (2001) (devisee liable only as to distributed assets); 90A C.J.S. *Trusts* § 586 (2001); *see also* RESTATEMENT (SECOND) OF TRUSTS § 274 (1959). These rules are subject to an exception if the beneficiary has received property from the estate or trust that should have been available for the payment of costs and fees. *See* RESTATEMENT (SECOND) OF TRUSTS § 274 (1959); AS 13.16.635 (estate distributee not liable for amounts in excess of value of distribution); 97 C.J.S. *Wills* § 1972 (2001). We applied a similar exception in the case of wrongful death action statutory beneficiaries in *Soldotna,* 835 P.2d at 1221–22.