*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| NATHANIEL A. TODESCHI, | ) | |
| | ) | Supreme Court Nos. S-15542/15571 |
| Appellant and | ) | |
| Cross-Appellee, | ) | Superior Court No. 3AN-11-05283 CI |
| | ) | |
| v. | ) | O P I N I O N |
| | ) | |
| SUMITOMO METAL MINING | ) | No. 7167 – April 28, 2017 |
| POGO, LLC, | ) | |
| | ) | |
| Appellee and | ) | |
| Cross-Appellant. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, William F. Morse, Judge.

Appearances: Michael W. Flanigan, Flanigan & Bataille, Anchorage, for Appellant/Cross-Appellee. Sean Halloran, Littler Mendelson, Anchorage, for Appellee/Cross-Appellant.

Before: Stowers, Chief Justice, Fabe, Winfree, Maassen, and Bolger, Justices.

MAASSEN, Justice.

## I.    INTRODUCTION

A mine supervisor suffered back injuries over the course of his career and required several surgeries. His employer terminated his employment following his request for an accommodation and his renewed pursuit of a three-year-old workers' compensation claim. The supervisor sued, alleging breach of the covenant of good faith

and fair dealing and unlawful discrimination based both on a disability and on his assertion of the workers' compensation claim. The employer defended on grounds that the supervisor could no longer perform the essential functions of his job and had declined an offered accommodation; it also asserted that it was not liable for the workers' compensation claim. A jury returned a special verdict finding the employer liable for breach of the covenant of good faith and fair dealing and awarding the supervisor $215,000 in past lost income, but finding in the employer's favor on the supervisor's other claims.

The supervisor appeals. He argues that the superior court erred when it (1) denied his motion for a directed verdict on whether he has a disability; (2) denied his motion for judgment notwithstanding the verdict due to an inconsistency between the jury's decisions of two of his claims; (3) declined to give a burden-shifting or adverse inference instruction based on alleged spoliation of evidence; and (4) raised a statute of limitations defense by way of a jury instruction. The employer cross-appeals, arguing that the superior court erred in excluding one of its witnesses.

Seeing no error, we affirm. Because we resolve the appeal in the employer's favor, we do not reach the employer's cross-appeal.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

Nathaniel Todeschi began work at Pogo Mine in November 2005. The mine was operated by Teck-Pogo, Inc., which later merged with another company to form Sumitomo Metal Mining Pogo, LLC (Sumitomo), the defendant in this case. Sumitomo stipulated in the trial court that, for purposes of employer liability, it was the operator of Pogo Mine the entire time Todeschi worked there.

Todeschi was promoted to a supervisor position after less than a year at the mine. Sumitomo does not dispute that his work performance was at least acceptable.

As a supervisor, Todeschi was responsible for the safety and production targets of up to ten employees. He directed their activities, provided support, and ensured their safety and efficiency. This required that he spend a large part of his workday underground. According to Sumitomo's job description, underground mine supervisors could travel up to 30 miles in the mine during one 13-hour shift. For these purposes Sumitomo provided both trucks and Kubota tractors; the tractors had minimal suspension, but Sumitomo claimed it could neither completely eliminate their use nor significantly improve their suspension.

Todeschi had a history of job-related back injuries, which he testified were aggravated whenever he had to drive a tractor. His first back surgery was before he worked at Pogo Mine. He had another surgery in 2008, but it was ineffective; according to Todeschi, he had a herniated disk that broke into fragments. He testified that in order to continue working without pain he consumed so many painkillers that his doctor thought he had cirrhosis of the liver. He had a back fusion in May 2009 to address the problem.

When Todeschi returned to work at the mine later that year, Paul Brunelle, a Pogo general foreman, assigned him to a special project that kept him at a desk. When the special project was completed Todeschi resumed his duties as an underground supervisor. His physician had given him a full medical release with no restrictions, but, according to Todeschi, the doctor had not anticipated that he would be required to drive a tractor again.

Todeschi soon sent an email to Chad Omaha, another Pogo general foreman, stating that he would "not operate a Kubota tractor for any reason" because of

the risk of further injury to his back. He said Sumitomo was "asking [him] to choose between [his] job and [his] ability to walk and have a normal life" and he had "made all the compromises [he was] going to make on the issue." He asked for other "suitable reliable transportation . . . so that [he might] continue in [his] current capacity as a shift supervisor" and concluded that he would "give it [until] Monday to see if suitable arrangements are made[;] if not you do as you choose." Todeschi apparently continued working his shifts for awhile, using a truck. But in the meantime, Sumitomo supervisors and the company's attorney, Sean Halloran, began discussing by email how Todeschi's injury might be accommodated and whether he should be terminated instead.

A few weeks after Todeschi's email ultimatum, Sumitomo sent him to an independent medical exam with Dr. John Michael James. Sumitomo's human resources manager, Thomas Brokaw, provided Dr. James with a newly drafted job description that included a requirement that mine supervisors be able to "replace water pumps (lifting 60lbs to 250lbs depending on the pump being replaced) on their own." Dr. James found the lifting requirement to be unreasonable for even a healthy employee; he concluded that Todeschi could lift items up to 50 pounds occasionally, should not lift anything more than 40 pounds repetitively, and should be provided a truck as an accommodation.

Having received Dr. James's evaluation, Sumitomo terminated Todeschi's employment effective that day on grounds that he "could not perform his regular job due to strict lifting limitations and other restrictions as indicated by [Dr. James]." Sumitomo claims its motivation for firing Todeschi was his inability to drive a tractor, though the termination notice did not say so. Todeschi contends, on the other hand, that Sumitomo fired him because he requested the accommodation and because he had sought to reopen a workers' compensation claim he originally filed after his 2007 workplace injury.

Todeschi testified that he abandoned the 2007 workers' compensation claim after Kim Witt, the Pogo human resources manager at the time, told him he would lose his job if he pursued it. Todeschi testified that he used his private insurance to pay for the required medical care but refused to release the workers' compensation insurer, which is why the claim remained open in 2010. Halloran, Sumitomo's attorney, testified that Todeschi's renewed pursuit of the claim was irrelevant to Sumitomo because it predated Sumitomo's operation of the mine and was covered by its predecessor's insurance. Todeschi settled the claim for $80,000 in 2011, while this suit was pending.

Todeschi filed his complaint against Sumitomo in February 2011. He alleged claims for (1) discrimination on the basis of a disability under AS 18.80.220(a)(1);[1] (2) failure to accommodate his disability under the same statute;[2] (3) breach of the implied covenant of good faith and fair dealing; and (4) discrimination under AS 23.30.247(a) based on his assertion of the workers' compensation claim.[3]

---

[1] "Except as provided in (c) of this section, it is unlawful for (1) an employer to refuse employment to a person, or to bar a person from employment, or to discriminate against a person in compensation or in a term, condition, or privilege of employment because of the person's . . . physical or mental disability." AS 18.80.220(a)(1).

[2] *Wondzell v. Alaska Wood Prods., Inc.*, 583 P.2d 860, 864 (Alaska 1978) ("We are persuaded that a duty of reasonable accommodation should be read into [AS 18.80.220(a)].").

[3] "An employer may not discriminate in hiring, promotion, or retention policies or practices against an employee who has in good faith filed a claim for or received benefits under this chapter. An employer who violates this section is liable to the employee for damages to be assessed by the court in a private civil action." AS 23.30.247(a).

### B. Proceedings

#### 1. Todeschi's motion for burden-shifting or an adverse inference instruction based on Sumitomo's alleged spoliation of evidence

Thomas Brokaw, Sumitomo's human resources manager at the time of Todeschi's termination, died before trial and without being deposed. Sumitomo substituted its attorney Halloran on its witness list. It explained that Halloran had discussed Todeschi's termination with Brokaw and could testify about those discussions, and it waived the attorney-client privilege to that extent.

Todeschi opposed Halloran's designation as a witness as untimely, requesting in the alternative that Sumitomo produce all of Halloran's written and electronic legal advice for this case and any similar cases. The superior court allowed Halloran's testimony but ordered that Sumitomo produce his billing and phone records for the matter, as well as any related communications or memoranda. The court restricted the required production to the period from a month before Todeschi's email ultimatum to a month after his termination, but it noted that any records outside that scope could be reviewed in camera, and it required Sumitomo to create a privilege log.

Halloran turned over few emails and phone records and no billing records. He testified that he never billed Sumitomo during 2010 and that he had destroyed any notes when he changed law firms; that his former firm inadvertently destroyed all his emails; and that some of his phone calls used a "voice over internet protocol" (VOIP) system that did not create a record of the call. Emails between Halloran and Brokaw were produced by Sumitomo, but the collection was not complete; Halloran testified that "Brokaw kept the emails that he believed mattered to anything, and he deleted emails that he thought were unimportant."

Todeschi moved for a shifting of the burden of proof on his discrimination claims to Sumitomo, or in the alternative a jury instruction allowing an inference that any

missing email, phone, and billing records of Halloran's would have supported his case. The superior court denied the motion, saying only, "I'm not giving a presumption instruction. I don't think that you've met the burden for that."

### 2. Jury instruction arguably raising a statute of limitations defense

Todeschi also objected to a jury instruction, contending that it invited the jury to apply a statute of limitations defense that Sumitomo had never pleaded. Instruction Number 12 read:

> You have heard testimony that Kim Witt engaged in certain conduct. Sumitomo cannot be held responsible for Witt's conduct before 2009. However, if you find that Witt engaged in certain conduct before 2009 you may (but need not) further find that it provides context for Sumitomo's actions or omissions in 2010.

Before trial Sumitomo had stipulated that "Teck-Pogo Inc. is the same entity as Sumitomo Metal Mining Pogo, LLC. Although the name and corporate form were changed when the company was sold a couple years ago, they are, in fact and law, one and the same entity. Thus, . . . Kim Witt . . . [was a] Sumitomo employee[]."

Todeschi argued that Instruction Number 12 effectively negated Sumitomo's stipulation of fact. He argued that the stipulation allowed him to causally connect Witt's actions in 2008 and his termination in 2010, but the instruction precluded that argument when it said that Sumitomo could not "be held responsible for Witt's conduct before 2009." Sumitomo countered that the instruction only prevented the jury from finding it liable for Witt's alleged threat, and Todeschi had not asserted a claim based on the alleged threat itself; the claim Todeschi *did* bring involved his 2010 firing by Sumitomo, and the instruction specifically allowed Todeschi to use Witt's alleged threat as background to that event.

The court overruled Todeschi's objection and gave Jury Instruction 12.

### 3.     Directed verdict

At the close of the evidence Todeschi moved for a directed verdict on the issue of whether he had a disability.  He argued that Dr. James's evaluation conclusively showed he was restricted from a class of jobs and therefore had a physical disability, as defined by federal law, because he was substantially limited in the major life activity of working.  The argument relied on federal regulations and the Equal Employment Opportunity Commission's interpretation of the Americans with Disability Act Amendments Act.[4]

Sumitomo countered by pointing to Todeschi's full medical release from his own doctor, differing from Dr. James's more guarded evaluation.  Sumitomo also argued that the jury might not believe that Todeschi's claimed restrictions were disabilities:  While a lifting restriction might prevent him from doing some jobs, the one cited in Dr. James's evaluation was a restriction any average person might have and did not prevent Todeschi from working at Pogo Mine.  And no evidence suggested that an inability to drive a tractor could constitute a physical disability; even if it prevented Todeschi from being a mine supervisor, it did not necessarily bar him from an entire class of jobs, which is what the legal definition of "disability" required.

The superior court found Todeschi's argument that he had a disability "extremely strong" but denied his motion for directed verdict, concluding that whether

---

[4]     *See* 29 C.F.R. § 1630 (2013); ADA Amendments Act, Pub. L. No. 110-325, 122 Stat. 3553 (2008) (amending Americans with Disabilities Act, 42 U.S.C. §§ 12101-12213; *see also* 6 Alaska Administrative Code (AAC) 30.910(b) (2007) ("In deciding complaints of alleged discrimination under AS 18.80 in employment, state and local government services, or public accommodations because of physical or mental disability, the commission may use 42 U.S.C. 12101 – 12213 (Americans with Disabilities Act) and relevant federal case law as a guideline.").

he had a disability was a question of fact that the jury could reasonably answer either way.

### 4.     Motion for judgment notwithstanding the verdict

The jury was asked to answer four questions about liability.  It answered "no" to three of them:  (1) Whether Sumitomo terminated Todeschi's employment "due to a disability in violation of [AS] 18.80.[220]"; (2) whether Sumitomo "fail[ed] to make a reasonable accommodation so that [Todeschi] could continue his employment"; and (3) whether "Todeschi's pursuit of workers' compensation benefits" was "a substantial factor in Sumitomo's termination of his employment."  The jury answered "yes" to one liability question:  Whether Sumitomo "breach[ed] the covenant of good faith and fair dealing when [it] terminated Todeschi's employment."  For his one successful claim the jury awarded Todeschi $215,000 in past lost income.

Todeschi moved for a judgment notwithstanding the verdict, additur, or a new trial.  In support of a judgment notwithstanding the verdict — the only aspect of the motion relevant to this appeal — Todeschi argued that he had conclusively proven his claim for discrimination based on disability and that the jury's special verdict was necessarily inconsistent; he argued that the jury could only have found a breach of the covenant of good faith and fair dealing on a view of the facts that also required it to find disability discrimination.

The superior court found no inconsistency in the jury verdict, however, and denied Todeschi's motion.  This appeal followed.

## III. STANDARDS OF REVIEW

We review the denial of a motion for judgment notwithstanding the verdict (JNOV) using the same standard we use when reviewing a directed verdict.[5] "[B]ecause the sufficiency of the evidence to support a jury verdict is a question of law, our review [of motions for JNOV and directed verdict] is de novo."[6] When we review a trial court's decision on a motion for directed verdict, "we must decide 'whether the evidence, when considered in the light most favorable to the nonmoving party, is such that reasonable persons could not differ in their judgment.' "[7] "[C]onflicting evidence is not to be weighed and witness credibility is not to be judged on appeal."[8] We scrutinize JNOV and directed verdict motions "under a principle of minimum intrusion into the right to jury trial guaranteed under the Alaska Constitution. . . . If there is any doubt, questions of fact should be submitted to the jury."[9]

We review the superior court's decisions of discovery sanctions, such as spoliation remedies, for abuse of discretion.[10] "The choice of a particular sanction for a discovery violation generally is a matter committed to the broad discretion of the trial

---

[5]     *Lynden, Inc. v. Walker*, 30 P.3d 609, 612 (Alaska 2001) (citing *Alaska Tae Woong Venture Inc. v. Westward Seafoods, Inc.*, 963 P.2d 1055, 1062 (Alaska 1998)).

[6]     *Cameron v. Chang-Craft*, 251 P.3d 1008, 1018 (Alaska 2011).

[7]     *Noffke v. Perez*, 178 P.3d 1141, 1144 (Alaska 2008) (quoting *Hagen Ins., Inc. v. Roller*, 139 P.3d 1216, 1219 (Alaska 2006)); *see also Cameron*, 251 P.3d at 1017.

[8]     *Cameron*, 251 P.3d at 1017-18.

[9]     *Id.* (alteration in original) (quoting *City of Delta Junction v. Mack Trucks, Inc.*, 670 P.2d 1128, 1130 n.2 (Alaska 1983)).

[10]     *Mills v. Hankla*, 297 P.3d 158, 164-65 (Alaska 2013) (quoting *Wooten v. Hinton*, 202 P.3d 1148, 1155 (Alaska 2009)).

court."[11]  "We review a trial court's findings of fact underlying its discovery sanction determination for clear error and 'will not declare a trial court's finding to be clearly erroneous unless, after a review of the entire record, we are left with a definite and firm conviction that a mistake has been made.' "[12]  Whether there has been spoliation is a finding of fact.[13]

" 'Jury instructions involve questions of law to which we apply our independent judgment.' 'When reviewing a trial court's denial of a proposed instruction, our inquiry focuses upon whether the instructions given, when read as a whole, adequately inform the jury of the relevant law.' "[14]  "An error in jury instructions is grounds for reversal only if it caused prejudice."[15]  "In evaluating whether there has been prejudicial error with regard to jury instructions, we put ourselves in the position of the jurors and 'determine whether the error probably affected their judgment.' "[16]

---

[11]     *Powell v. Tanner*, 59 P.3d 246, 253 (Alaska 2002).

[12]     *Mills*, 297 P.3d at 165 (quoting *Spenard Action Comm. v. Lot 3, Block 1, Evergreen Subdivision*, 902 P.2d 766, 776 (Alaska 1995)).

[13]     *See id.* (explaining "[t]he superior court's finding that there was no spoliation was not clearly erroneous").

[14]     *City of Hooper Bay v. Bunyan*, 359 P.3d 972, 978 (Alaska 2015) (quoting *Thompson v. Cooper*, 290 P.3d 393, 398 (Alaska 2012)).

[15]     *Id.* (quoting *Thompson*, 290 P.3d at 398-99).

[16]     *Id.* (quoting *Thompson*, 290 P.3d at 399).

## IV. DISCUSSION

### A. Viewing The Evidence In The Light Most Favorable To Sumitomo, A Reasonable Jury Could Have Found That Todeschi Did Not Have A Disability.

Alaska's human rights statutes proscribe certain employment practices, including "discriminat[ing] against a person in compensation or in a term, condition, or privilege of employment because of the person's . . . physical or mental disability."[17] "Physical or mental disability" is defined to mean "a physical or mental impairment that substantially limits one or more major life activities."[18] "Major life activities," in turn, are defined as "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."[19] Todeschi argues that the trial court should have directed a verdict in his favor on whether he had a disability within the meaning of these statutes — a predicate to his disability discrimination claim — because the evidence at trial demonstrated conclusively that his lifting restrictions substantially limited him in the "major life activity" of working.

In support of this argument, Todeschi points to an example in the federal regulations implementing the Americans with Disabilities Act Amendments Act:

> [I]f a person whose job requires heavy lifting develops a disability that prevents him or her from lifting more than fifty pounds and, consequently, from performing *not only his or her existing job* but also other jobs that would similarly require heavy lifting, that person would be substantially

---

[17] AS 18.80.220(a)(1).

[18] AS 18.80.300(14)(A).

[19] AS 18.80.300(10).

limited in working because he or she is substantially limited in performing the class of jobs that require heavy lifting.[20]

Todeschi argues that this example and his own situation "match[] perfectly" and that both Alaska's anti-discrimination statute and the federal law it incorporates[21] required the conclusion that he had a disability as a matter of law.

But whether the example matches Todeschi's case depends on facts the jury could reasonably have found in Sumitomo's favor. First, Sumitomo presented evidence that the lifting requirement did not prevent Todeschi from performing his "existing job." The job description given Dr. James for purposes of the independent medical exam — stating a job requirement of "lifting 60lbs to 250lbs depending on the pump being replaced" — was in Dr. James's opinion unreasonable, but Sumitomo contended that as reasonably interpreted it only described lifting with mechanical aids and that Todeschi never actually had to lift anything so heavy by himself in order to perform his job.

Second, the federal example requires the jury to find that Todeschi's inability to meet the lifting requirement barred him from a "class of jobs." He points to the uncontested expert testimony of a vocational counselor that he could not work in several categories of jobs, but the jury could have chosen to assign no weight to that testimony. Rather, using their own experience or relying on evidence such as Dr. James's opinion that the lifting requirement was "fairly unreasonable for a[n] uninjured worker," jurors may have found that Todeschi was no more restricted than an average person. The jury may also have relied on Todeschi's full medical release with no restrictions that predated Dr. James's evaluation to conclude that Todeschi was not precluded from performing a "class of jobs."

---

[20]     29 C.F.R. app. § 1630.2(j)(5) & (6) (2013) (emphasis added).

[21]     *See supra* note 4.

In short, although Todeschi offered evidence sufficient to support a conclusion that he was limited in the "major life activity" of working and therefore had a disability, the jury was not required to accept it as true in light of the conflicting evidence. We conclude that the superior court did not err when it denied Todeschi's motion for a directed verdict on the disability issue.

**B.** **A Reasonable Jury Could Consistently Find That Sumitomo Breached The Covenant Of Good Faith And Fair Dealing But Did Not Discriminate Against Todeschi On The Basis Of A Disability.**

Todeschi argues that because the jury found that Sumitomo breached the covenant of good faith and fair dealing, it could not consistently find that the company did not discriminate against him on the basis of a disability.[22] Jury Instruction 26 informed the jury how to decide whether Sumitomo had breached the covenant:

> The defendant violated the implied promise of good faith and fair dealing if you find that it is more likely true than not true that the defendant deprived the plaintiff of a benefit of the contract:
>
> 1. by acting in bad faith; or
>
> 2. by acting in a manner that a reasonable person would regard as unfair.

---

[22] Although Alaska Civil Rule 50(b) generally limits motions for judgment notwithstanding the verdict to parties who have moved for directed verdict "at the close of all the evidence," Todeschi was not required to make a directed verdict motion in order to preserve his motion for judgment notwithstanding the verdict. He moved for judgment notwithstanding the verdict "*because* of findings made in the special verdict, rather than *notwithstanding* them." *Borgen v. A & M Motors, Inc.*, 273 P.3d 575, 584 (Alaska 2012) (emphasis in original). This is the exception to the usual procedural rule, because "a jury's verdict . . . could not have been known before the case was submitted to the jury." *Alaska Interstate Constr., LLC v. Pacific Diversified Invs., Inc.*, 279 P.3d 1156, 1172 (Alaska 2012).

Todeschi argues that the only act the jury could reasonably have found to satisfy either requirement of this instruction is Sumitomo's submission of the job description to Dr. James suggesting that Todeschi was required to lift as much as 250 pounds as part of his job, "then using the failure to meet those lifting requirements as the basis for a termination." Todeschi asserts that if the jury agreed the job description was unfair and that Sumitomo fired him because of his failure to meet its requirements, it must have believed that he was discriminated against because of a disability.

But the jury's verdicts can be harmonized. Instruction 26 allowed the jury to consider a broad landscape of actions and motivations in determining whether Sumitomo breached the covenant of good faith and fair dealing, requiring only a finding that the defendant, at some point, acted "in a manner that a reasonable person would regard as unfair." Conversely, the instructions on disability discrimination required more — and more specific — findings. Instruction 15, defining a "disability discrimination claim under AS 18.80.220," required Todeschi to "prove it is more likely true than not true that: (1) . . . he is an individual who has a disability within the meaning of the statute; [and] (2) . . . he could perform the essential functions of the position he held (with or without reasonable accommodation)." The jury could reasonably conclude that although Sumitomo acted "unfairly" by creating a job description that would give the company an excuse for terminating Todeschi's employment, Todeschi did not have a disability discrimination claim as Instruction 15 defined it.

Todeschi made arguments in the trial court that are consistent with this harmonization of the jury's verdicts. He successfully opposed a version of Instruction 26 that would have required a finding of discrimination as the basis for a breach of the covenant, arguing that "[a] breach of the covenant of good faith and fair dealing is not limited to discriminatory reasons for termination." The court accordingly removed language from the instruction that would have prevented the jury from finding a breach

of the covenant if Todeschi's termination was based on a "permissible, that is[,] a *non-discriminatory* reason." (Emphasis added.)

Thus, consistent with its instructions, the jury might have found that Todeschi did not have a disability but that Sumitomo nonetheless acted unfairly during the process of terminating him. Todeschi's counsel argued repeatedly in closing that Sumitomo's managers knew that the job description was "rigged," that its lifting requirements "were false," and that this was evidence "that Todeschi was treated unfairly, in bad faith," and in breach of the covenant of good faith and fair dealing. The jury may have agreed.

Alternatively, the jury might have found that Todeschi *did* have a disability but that Sumitomo did not unlawfully discriminate against him on that basis but rather terminated him lawfully because he could not perform the essential functions of his job with or without reasonable accommodation. There was evidence from which the jury could reasonably conclude that driving a tractor was an essential function of the job of underground supervisor; there was also evidence that providing Todeschi with a truck instead — the specific accommodation he demanded — was not "feasible for [Sumitomo] under the circumstances," as the jury instructions required.[23] Steven Job, a mine superintendent, testified that "an integral part of what [they] do in the underground is driving tractors." Todeschi conceded that he had been told driving a tractor was part of his job.[24] According to Larry Davey, a Pogo general manager, the

---

[23]  Jury Instruction No. 21A provided, in part, that "[t]o succeed on a claim that the employer has failed to provide a reasonable accommodation, the employee must prove . . . [t]hat the proposed accommodation would enable him to perform the essential functions of the job and that the accommodation is feasible for the employer under the circumstances."

[24]  The jury was given a list of nine factors to consider in deciding "what the
(continued...)

only way Sumitomo could ensure that Todeschi always had a truck available for his use would be "to replace the entire fleet of tractors with trucks," which "was certainly not a viable option." Davey testified that Sumitomo tested equipment to replace tractors "many times during the years while [he] was at Pogo" but "at no point could we arrive at a piece of equipment that had the reliability of tractors." Paul Brunelle, a Pogo underground mine general foreman, testified that trucks broke down about 60 percent of the time when used underground. The jury was entitled to accept this evidence in deciding that Todeschi — if he had a disability — could not perform the essential functions of his job and that the accommodation of driving a truck instead of a tractor would either not allow him to perform those essential functions or would not be feasible for his employer under the circumstances.[25]

The jury's special verdicts can thus be read consistently. Even if they appeared to be inconsistent, "[w]e will not disturb a jury verdict if there is a theory which reconciles the apparent inconsistencies."[26] When viewing the evidence in the light most favorable to Sumitomo, we conclude that a reasonable jury could find a breach of the

---

[24](...continued)
essential functions of a job are" and was instructed that "[n]o one factor is necessarily controlling." "The employer's judgment as to which functions of the job are essential" was one of those nine factors.

[25] There was also evidence from which the jury could conclude that Todeschi refused a reasonable accommodation: Davey testified that he approved a "surface trainer" job for Brokaw to offer Todeschi. Todeschi, though denying he was offered such a job, conceded that "[t]here was a mention of a surface trainer job" in his discussions with Brokaw but he voiced his concerns about the possible difference in pay, including loss of the "underground bonus."

[26] *Yang v. Yoo*, 812 P.2d 210, 215 (Alaska 1991); *see also Conley v. Alaska Commc'ns Sys. Holdings, Inc.*, 323 P.3d 1131, 1141-42 (Alaska 2014) (affirming the trial court's denial of JNOV because the court could reconcile the jury's verdict).

covenant of good faith and fair dealing and also find, consistently, that Todeschi did not prove the elements of a claim for discrimination based on disability. We therefore affirm the superior court's denial of Todeschi's motion for a judgment notwithstanding the verdict.

**C.** **The Superior Court Did Not Abuse Its Discretion When It Denied Todeschi's Request For A Spoliation Remedy.**

Todeschi moved in limine that the burden of proof on his discrimination claims be shifted to the defense or, alternatively, that the jury be given an adverse inference instruction based on Sumitomo's alleged spoliation of evidence, citing the absence of records — billings, phone records, and emails — memorializing the discussions between Sumitomo and Halloran, its attorney, at the time of Todeschi's termination. Todeschi argued that this evidence might show Sumitomo's improper motivations for firing him, relevant to his discrimination claims, and that the jury should at least be instructed it could infer that the evidence would favor his case. On appeal he contends that the superior "court erred in refusing to give an appropriate instruction in light of the spoliation of evidence."

The superior court did not decide Todeschi's motion until ruling on objections to proposed jury instructions. The court then denied the motion, saying only that Todeschi had not "met the burden for [a spoliation instruction]." We conclude this was not an abuse of discretion.

**1.** **It was not an abuse of discretion to refuse to give a burden-shifting instruction.**

We first addressed remedies for negligent spoliation in *Sweet v. Sisters of Providence in Washington*, in which we set out the steps that must precede the giving of

a burden-shifting instruction.[27]  First, it is the plaintiff's burden to "establish to the satisfaction of the court that the absence of the records hinders his ability to establish a prima facie case."[28]  This requires the plaintiff to demonstrate how "the absence of an adequate [record] *sufficiently hinders* [the] plaintiff's ability to proceed."[29]  Second, "burden shifting should only occur when the essential . . . records are missing through the negligence or fault of the adverse party."[30]  "Negligence or fault" are concepts that depend on the existence of a duty to preserve the records.[31]

---

[27]      895 P.2d 484, 490-93 (Alaska 1995).  Todeschi does not argue on appeal for an independent tort based on intentional spoliation.  We have held that "where traditional discovery sanctions can sufficiently redress the harm caused by the wrongful withholding of evidence, those remedies are exclusive."  *Allstate Ins. Co. v. Dooley*, 243 P.3d 197, 200 (Alaska 2010).

[28]      *Sweet*, 895 P.2d at 491 (quoting *Pub. Health Tr. of Dade Cty. v. Valcin*, 507 So. 2d 596, 599 (Fla. 1987) (relying in turn on *Patrick v. Sedwick*, 391 P.2d 453, 457 (Alaska 1964))).

[29]      *Id.* (quoting *Valcin*, 507 So. 2d at 601) (emphasis added); *Zaverl v. Hanley*, 64 P.3d 809, 821 (Alaska 2003) (distinguishing *Sweet* on the ground that "[i]n this case, . . . the estate advances no plausible theory demonstrating that the delay [in the defendant hospital's preparation of a patient's discharge summary] prejudiced its case").

[30]      *Sweet*, 895 P.2d at 491 (citing *Valcin*, 507 So. 2d at 599).

[31]      *See Power Constructors, Inc. v. Taylor & Hintze*, 960 P.2d 20, 29-30 & n.9 (Alaska 1998) (distinguishing *Sweet* in part because of the plaintiff's lack of evidentiary support for its "general allegation that [the defendant] had an obligation to preserve the evidence" or any explanation "why [the defendant] should be held to a superior duty of preservation than [the plaintiff] itself"); *In re Standard Jury Instructions in Civil Cases — Report No. 15-01*, 192 So. 3d 1183, 1187 (Fla. 2016) (per curiam) (noting that a burden-shifting jury instruction "applies only when the court has determined that there was a [legal] duty" to maintain the evidence); *Martino v. Wal-Mart Stores, Inc.*, 908 So. 2d 342, 348 (Fla. 2005) (Wells, J., concurring) ("It is fundamental to the entire legal basis for spoliation of evidence that the owner or possessor of property have a legally

(continued...)

When the two elements of negligent spoliation are met, the party who might have benefitted from the missing evidence is entitled to a rebuttable presumption that the missing evidence would support its case.[32] Though this presumption is rebuttable, "[i]t is not overcome until the trier of fact believes that the presumed fact has been overcome by whatever degree of persuasion is required by the substantive law of the case."[33] We held in *Sweet* that "the trial court should have adopted a rebuttable presumption that [the defendant hospital] was medically negligent in treating [the plaintiff] and that this negligence legally caused [the plaintiff's] injuries" because the hospital failed to maintain its patient's medical records, some of which would likely have contained substantive information directly relevant to the plaintiff's claims: signed informed consent forms, nursing records from the day the plaintiff suffered a prolonged seizure allegedly resulting in brain damage, and "a contemporaneously created record" of that incident from the treatment room.[34]

On the other hand, in another medical malpractice case, *Zaverl v. Hanley*, we found no error in the trial court's refusal to presume negligence when a hospital discharge summary was prepared 45 days after the patient's discharge.[35] In contrast to the facts of *Sweet*, the record in *Zaverl* was not absent but delayed, and the plaintiff did

---

[31](...continued)
defined duty to maintain or preserve the property.").

[32]    *Sweet*, 895 P.2d at 492.

[33]    *Id.* (quoting *Valcin*, 507 So. 2d at 600-01).

[34]    *Id.* at 490, 492.

[35]    64 P.3d 809, 820-21 (Alaska 2003).

not explain how the record would have been different had it been timely prepared or any other way in which his case was prejudiced.[36]

In *Miller v. Phillips* we affirmed the superior court's rejection of a burden-shifting instruction informing the jury that it must presume a nursing note was complete and accurate and that the health-care providers had the burden of proving they performed any procedures not described in the note.[37] We found *Sweet* inapposite because it was "expressly based . . . on two uncontroverted factors: the hospital's negligence in losing the records and the plaintiffs' inability to establish a convincing prima facie case . . . without them."[38] We explained that in *Miller* "there was no uncontroverted proof of lost or inadequate records[; t]o the contrary, the adequacy and completeness of the medical records was a hotly disputed factual issue."[39] We noted further that the "alleged deficiencies in the delivery-room records" did not "hinder the [plaintiffs] in presenting a prima facie case of malpractice," but rather allowed them "to attack [the nurse's] trial testimony as inconsistent with her notes and therefore incredible."[40]

In this case, although Todeschi asserted that some records were missing, he failed to demonstrate why their absence hindered his ability to establish a prima facie case. First, with regard to billing records, Halloran admitted he created some records of his time but destroyed them when he left his former firm in March 2011 (about the time Todeschi filed this lawsuit); he testified that he never billed Sumitomo for the work he

---

[36]    *Id.* at 821.

[37]    959 P.2d 1247, 1253-54 (Alaska 1998).

[38]    *Id.* at 1254.

[39]    *Id.*

[40]    *Id.*

did for it in 2010 because "it wasn't an amount of money that was worth putting any further effort into, and so [he] didn't have the bill go out." Todeschi argues that the missing billing records would "provide insight" and that their absence is "obviously prejudic[ial]," but he does not explain how or why.

As for phone records, Halloran's land-line calls were reflected in his former firm's records but some calls he testified about were not. Thus Todeschi was given records that showed calls between Halloran and Brokaw, and their length, on the day Todeschi was sent for his medical evaluation with Dr. James, but he had no records to confirm Halloran's testimony that he made two calls to Brokaw on May 11, 2010, the day Todeschi was fired. But Todeschi again does not plausibly explain how his case would be strengthened by records that showed simply when calls were made.

Finally, as for emails, Sumitomo produced a number of them between Brokaw and Halloran, including a lengthy and substantive one Todeschi relied on heavily in post-trial briefing as definitive proof of Sumitomo's unlawful intent.[41] But again — especially given the evidence he had of Sumitomo's reasoning process — Todeschi does not explain why his lack of additional emails "sufficiently hinder[ed] [his] ability to proceed" in establishing a prima facie case.[42]

Todeschi did posit that the missing evidence would aid him in "cross-examin[ing] Halloran about his alleged email and phone communications with Brokaw

---

[41]    This email discussed Sumitomo's options for accommodating Todeschi's claimed disability before concluding: "If, on the other hand, his contributions are such that the mine would just as soon have someone else in the position, or if this is just one instance in a string of his acting like a prima donna, then his refusal to perform the task of driving the tractor presents an opportunity to terminate his employment, replace him, and move on."

[42]    *Sweet v. Sisters of Providence in Wash.*, 895 P.2d 484, 491 (Alaska 1995) (quoting *Pub. Health Tr. of Dade Cty. v. Valcin*, 507 So. 2d 596, 601 (Fla. 1987)).

wherein he claims they discussed Brokaw's reasons for terminating Todeschi," but he had other evidence on which to rely to accomplish that goal. And, as in *Miller*, the gaps in the record gave Todeschi's counsel the opportunity to attack Halloran's credibility in closing arguments, when he argued essentially that evidence had been purposely withheld because it would have shown that Todeschi was terminated for reasons that violated the law.

We conclude that the facts of this case are closer to those in *Miller* and *Zaverl* than to those in *Sweet*. Although some of Halloran's records are missing, Todeschi does not demonstrate a plausible theory of how their absence "sufficiently hinder[ed] [his] ability to proceed" in establishing a prima facie case.[43] We review a superior court's decision whether to grant sanctions for alleged spoliation, including whether to give a presumption instruction, for abuse of discretion,[44] and we see no abuse of discretion here.

Because we conclude that Todeschi's claim fails to satisfy the first element of a spoliation claim — that loss of the evidence sufficiently hindered his ability to establish a prima facie case — we do not need to decide whether he proved the second element, "negligence or fault" on Sumitomo's part.[45] But we do note that while *Zaverl*,

---

[43]     *Id.* at 491 & n.6 (quoting *Valcin*, 507 So. 2d at 601).

[44]     *Mills v. Hankla*, 297 P.3d 158, 162-63, 164-65 (Alaska 2013).

[45]     *Sweet*, 895 P.2d at 491 ("[B]urden shifting should only occur when the essential medical records are missing through the negligence or fault of the adverse party." (citing *Valcin*, 507 So. 2d at 599)); *see also Doubleday v. State, Commercial Fisheries Entry Comm'n*, 238 P.3d 100, 106 (Alaska 2010) ("In order to obtain the benefit of the spoliation of evidence doctrine, Doubleday must . . . produce some evidence that the records are missing through the intentional or negligent act of the adverse party.").

*Miller*, and *Sweet* involved the well-recognized duty of a medical care provider to create and maintain medical records,[46] the source of a duty in this case is less obvious.[47]

> ## 2. Any error in refusing to give a permissible inference instruction was harmless.

As an alternative to burden-shifting, Todeschi also requested a less severe remedy: a jury instruction allowing the jury to make an adverse inference from Sumitomo's destruction of evidence. Todeschi's Proposed Instruction 24 would have instructed the jury that if it concluded that Halloran or Brokaw intentionally deleted emails regarding Todeschi's request for an accommodation, it could "infer from this fact" the additional fact that "the deleted emails would have proven a discriminatory intent" on Brokaw's part when he decided to terminate Todeschi's employment and that

---

[46] We recognized a medical care provider's duty to create and preserve medical records in *Patrick v. Sedwick*, 391 P.2d 453, 457 (Alaska 1964) (holding that a surgeon "was obligated to his client to prepare" a report that "described accurately and fully . . . everything of consequence that he did and which his trained eye observed during the operation").

[47] To establish a duty to preserve evidence, Todeschi relies on the claim he filed with the Equal Employment Opportunity Commission a month after his termination and the notice the Alaska Human Rights Commission then sent Sumitomo instructing the company not to delete Todeschi's personnel records. Other courts recognize that a duty to preserve evidence may arise as soon as litigation is reasonably foreseeable. *See, e.g.*, *League of Women Voters of Fla. v. Detzner*, 172 So. 3d 363, 391 (Fla. 2015); *Phillips v. Harmon*, 774 S.E.2d 596, 605 (Ga. 2015); *Ihli v. Lazzaretto*, 864 N.W.2d 483, 485-86 (N.D. 2015). But we are directed to no evidence that Brokaw, who was described as a regular deleter of nonessential emails, deleted relevant emails *after* he received the EEOC notice. And Halloran, the attorney, had no apparent duty to Todeschi to keep records of his time, his phone calls, and his work product, and no reason to believe that his records (such as they were) would be discoverable until Brokaw died two years after Todeschi's termination and Sumitomo sought to substitute Halloran as a witness in Brokaw's stead. *See, e.g.*, *Lewis v. Bloom*, 628 P.2d 308, 310 (N.M. 1981) (upholding trial court's refusal to impose spoliation sanctions where "[t]he tape recording was the attorney's work product which may be discovered only upon a showing of good cause").

the emails "were destroyed for the purpose of concealing that evidence." The proposed instruction made clear that the jury was "not required to" make the inference. The court refused to give the proposed instruction but told Todeschi's counsel that he could ask the jury to draw an inference from the records' nonexistence.

A permissible adverse inference, unlike the burden shifting addressed in *Sweet*, merely *allows* "the inference that the evidence was lost because it was damaging to the opposing party's case."[48] The inference does not shift the burden of proof at trial[49] but rather allows "[a] detrimental conclusion drawn by the fact-finder from a party's failure to produce evidence that is within the party's control."[50] The inference may be the subject of a jury instruction, or, as here, the nonspoliating party may be allowed to argue for the inference in closing arguments.[51]

---

[48] *Osmulski v. Oldsmar Fine Wine, Inc.*, 93 So. 3d 389, 394 (Fla. Dist. App. 2012).

[49] *Golden Yachts, Inc. v. Hall*, 920 So. 2d 777, 780 (Fla. Dist. App. 2006) (citing *Anesthesiology Critical Care & Pain Mgmt. Consultants v. Kretzer*, 802 So. 2d 346, 351 (Fla. Dist. App. 2001)).

[50] *Inference*, BLACK'S LAW DICTIONARY (10th ed. 2014).

[51] *See Mosaid Techs. Inc. v. Samsung Elecs. Co.*, 348 F. Supp. 2d 332, 339 (D.N.J. 2004) (approving and adopting a magistrate's "proposed spoliation inference jury instruction"); *Osmulski*, 93 So. 3d at 394 (allowing inference to be presented in argument); *Palmas Y Bambu, S.A. v. E. I. Dupont De Nemours & Co.*, 881 So. 2d 565, 581 (Fla. Dist. App. 2004) ("[T]he option of applying such an inference should have been limited to the arguments of counsel."); *Martino v. Wal-Mart Stores, Inc.*, 835 So. 2d 1251, 1257 n.2 (Fla. Dist. App. 2003) ("[W]hile counsel is free to make arguments concerning the adverse inference created by Wal-Mart's failure to produce the shopping cart and videotape, a jury instruction on this matter is not appropriate."); *Duquesne Light Co. v. Woodland Hills Sch. Dist.*, 700 A.2d 1038, 1050 (Pa. Commw. 1997) ("[W]here evidence has been destroyed, referral of the spoliation issue to a jury with accompanying instructions [on permissible inference] is the proper and advisable course of action.").

We have not previously discussed permissive adverse inference instructions as a remedy for spoliation, but we have long recognized a trial court's need for flexibility in determining sanctions for discovery violations.[52] "As with any discovery abuse or evidentiary issue, there is no one remedy that is appropriate for every incidence of spoliation; the trial court must respond appropriately based upon the particular facts of each individual case."[53] A number of courts follow a "totality of the circumstances" approach to determining whether to impose a sanction and what the sanction should be. Such an approach generally considers three factors: (1) "the degree of fault of the party who altered or destroyed the evidence"; (2) "the degree of prejudice suffered by the opposing party"; and (3) "whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future."[54] No single factor is dispositive, and

---

[52] *See Allstate Ins. Co. v. Dooley*, 243 P.3d 197, 203 (Alaska 2010) ("Civil Rule 37 grants trial courts broad discretion to fashion remedies for discovery order violations. A court may consider the nature and severity of the violation, the prejudice to the opposing party, and any other factors it deems appropriate."); *Powell v. Tanner*, 59 P.3d 246, 253 (Alaska 2002) ("The choice of a particular sanction for a discovery violation generally is a matter committed to the broad discretion of the trial court. . . ."); *Grimes v. Haslett*, 641 P.2d 813, 822 (Alaska 1982) ("The trial court has broad discretion in imposing sanctions respecting Rule 26(e), as it does under Rule 37. . . .").

[53] *Trevino v. Ortega*, 969 S.W.2d 950, 953 (Tex. 1998); *see also Brookshire Bros. v. Aldridge*, 438 S.W.3d 9, 21 (Tex. 2014) ("[T]he remedy crafted by the trial court must be proportionate when weighing the culpability of the spoliating party and the prejudice to the nonspoliating party." (citation omitted)); *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 81 (3d Cir. 1994) ("That sanction was not commensurate with the limited fault and prejudice present in this case.").

[54] *Schmid*, 13 F.3d at 79; *see also, e.g.*, *Apple Inc. v. Samsung Elecs. Co.*, 888 F. Supp. 2d 976, 992 (N.D. Cal. 2012); *Tatham v. Bridgestone Ams. Holding, Inc.*, 473 S.W.3d 734, 746-47 (Tenn. 2015) (applying similar four-factor test).

the trial court need not apply equal weight to every factor. Under such a test, thus, the spoliator's intent is a consideration but not necessarily determinative,[55] and a party that has not shown its entitlement to a burden-shifting instruction may nevertheless be allowed a permissive adverse inference.[56]

However, because the logical underpinning of the adverse inference is that the evidence would not have been destroyed had it not been damaging to the spoliator's case,[57] most jurisdictions still require that the spoliator have acted in bad faith or at least

---

[55] *See Apple, Inc.*, 888 F. Supp. 2d at 992 ("[W]hile a finding of bad faith is not a prerequisite for an adverse inference sanction, 'a party's motive or degree of fault in destroying evidence is relevant to what sanction, if any, is imposed." (quoting *UMG Recordings, Inc. v. Hummer Winblad Venture Partners (In re Napster, Inc. Copyright Litig.)*, 462 F. Supp. 2d 1060, 1066-67 (N.D. Cal. 2006))); *Tatham*, 473 S.W.3d at 746 ("Whether the conduct involved intentional misconduct simply should be one of the factors considered by the trial court.").

[56] *See Osmulski v. Oldmar Fine Wine, Inc.*, 93 So. 3d 389, 394 (Fla. Dist. App. 2012) ("[I]n a case like this which does not involve a statutory duty to provide medical records, the more appropriate remedy — if [the plaintiff] had proven entitlement to it — would be an adverse inference instruction from which a jury could infer that the videotape in this case was unfavorable to [the defendant]."); *American Hosp. Mgmt. Co. of Minn. v. Hettinger*, 904 So. 2d 547, 550-51 (Fla. Dist. App. 2005) (holding it was error to give a burden-shifting instruction where the defendant did not have a clear duty to preserve evidence, but that a permissive adverse inference instruction might be appropriate on remand).

[57] *Beaven v. U.S. Dep't of Justice*, 622 F.3d 540, 553-54 (6th Cir. 2010) ("[I]f there was 'no notice of pending litigation, the destruction of evidence does not point to consciousness of a weak case' . . . ." (quoting *Joostberns v. United Parcel Servs., Inc.*, 166 F. App'x 783, 797 (6th Cir. 2006))); *Testa v. Wal-Mart Stores, Inc.*, 144 F.3d 173, 177 (1st Cir. 1998) (explaining the inference's rationale as a "commonsense notion that a party who destroys a document (or permits it to be destroyed) when facing litigation, knowing the document's relevancy to issues in the case, may well do so out of a sense that the document's contents hurt his position" (citing *Beil v. Lakewood Eng'g & Mfg.*

(continued...)

negligently before imposing *any* sanction.[58]  The Florida Supreme Court — which we followed in adopting the burden-shifting presumption[59] — takes a different tack.  It has approved jury instructions that, while requiring burden-shifting if there has been a breach of a legal duty to maintain the lost records, allow an adverse inference when (1) a party caused evidence "to be unavailable, while it was within [the party's] possession, custody, or control," and (2) the evidence "would have been material in deciding the disputed issues in [the] case."[60]

---

[57](...continued)
*Co.*, 15 F.3d 546, 552 (6th Cir. 1994))); *Phillips v. Covenant Clinic*, 625 N.W.2d 714, 718 (Iowa 2001) ("The evidentiary value of the inference is derived from the common sense observation that a party who destroys a document with knowledge that it is relevant to litigation is likely to have been threatened by the document.").

[58]　　　*See, e.g.*, *Beers v. Bayliner Marine Corp.*, 675 A.2d 829, 833 (Conn. 1996) ("[T]he spoliator must be on notice that the evidence should be preserved."); *Kippenhan v. Chaulk Servs., Inc.*, 697 N.E.2d 527, 530 (Mass. 1998) ("Sanctions may be appropriate for the spoliation of evidence that occurs even before an action has been commenced, if a litigant or its expert knows or reasonably should know that the evidence might be relevant to a possible action."); *State v. Barnes*, 777 A.2d 140, 145 (R.I. 2001) ("Such a presumption or inference ordinarily would arise where the act was intentional or intended to suppress the truth, but 'does not ordinarily arise where the destruction was a matter of routine with no fraudulent intent.' " (citing 29 AM. JUR. 2D *Evidence* § 244 at 256)).

[59]　　　*See Sweet v. Sisters of Providence in Wash.*, 895 P.2d 484, 491 (Alaska 1995) (citing *Pub. Health Tr. of Dade Cty. v. Valcin*, 507 So. 2d 596, 599-601 (Fla. 1987)).

[60]　　　*In re Standard Jury Instructions in Civil Cases — Report No. 15-01*, 192 So. 3d 1183, 1186 (Fla. 2016); *see also League of Women Voters of Florida v. Detzner*, 172 So. 3d 363, 391 (Fla. 2015) ("Even in the absence of a legal duty, . . . the spoliation of evidence results in an adverse inference against the party that discarded or destroyed the evidence.").

We applied an adverse inference from the loss of evidence in *Thorne v. Department of Public Safety*,[61] which Todeschi cites in his brief. In *Thorne* we held that due process required the State to preserve videotape of a driver's performance on field sobriety tests, made in the course of his arrest for driving under the influence, for use in a later license revocation proceeding.[62] In fashioning a sanction we considered "the degree of culpability on the part of the [S]tate, the importance of the evidence lost, the prejudice suffered by the accused, and the evidence of guilt adduced at the trial or hearing."[63] We decided that the videotape evidence was important, that its loss "infringed Thorne's ability to fully contest the issue" of whether he appeared inebriated at the time of his arrest, and that the burden on the State to preserve the videotape was slight.[64] We concluded that "considerations of fundamental fairness dictate that where the burden of preservation is so slight," the State bore "a heavy burden in justifying [the evidence's] destruction," a burden that it failed to carry.[65] We remanded the case to the hearing officer in the license revocation proceeding "with directions to presume that the videotape would have been favorable to Thorne";[66] the inference was thus required rather than permissive.

We have never applied *Thorne*'s due process analysis to a civil case in which *Sweet*'s burden-shifting remedy for spoliation was available to address the same

---

[61]    774 P.2d 1326 (Alaska 1989).

[62]    *Id.* at 1330.

[63]    *Id.* at 1331 (citing *Putnam v. State*, 629 P.2d 35, 43-44 (Alaska 1980); *State v. Contreras*, 674 P.2d 792, 821 (Alaska App. 1983)).

[64]    *Id.* at 1330-31.

[65]    *Id.* at 1330-31.

[66]    *Id.* at 1331.

circumstances: i.e., the lost evidence was clearly important and the party that lost it should have recognized the need to preserve it.[67] And we decline to decide today whether a permissive inference instruction must necessarily be considered as an alternative to a burden-shifting instruction, or what a litigant has to show to be entitled to a permissive inference instruction under Alaska law. Several considerations dissuade us from deciding these issues. First, adverse inference instructions take different forms in different jurisdictions, particularly with regard to whether a duty to preserve the evidence is a prerequisite, and the advantages of the varied approaches have not been briefed in this appeal.[68] Second, even if Alaska law were clear on this issue and the superior court had refused to give an instruction stating the law, we would not necessarily find error, as we review such decisions for abuse of discretion.[69] And third, even if the failure to give the proposed instruction was an abuse of discretion, on this record it could only have been harmless.

As noted above, when the superior court denied Todeschi's request for an adverse inference instruction, it invited him to make the same point in argument, which

---

[67]     *See Sweet v. Sisters of Providence in Wash.*, 895 P.2d 484, 491 (Alaska 1995).

[68]     In support of his cursory argument for a permissive adverse inference, Todeschi cites only *Thorne*, 774 P.2d at 1330-31, as he did below. Sumitomo's briefing on the issue concerns itself only with the facts.

[69]     *Mills v. Hankla*, 297 P.3d 158, 165 (Alaska 2013) (finding no clear error in superior court's conclusion that relevant records were not missing from personnel file and "that it was not an abuse of discretion for the superior court to deny sanctions"); *Stinson v. Holder*, 996 P.2d 1238, 1244 (Alaska 2000) ("The decision whether to include a particular instruction rests with the discretion of the trial court." (quoting *Coulson v. Marsh & McLennan, Inc.*, 973 P.2d 1142, 1150 n.21 (Alaska 1999))).

his counsel did strongly and repeatedly.[70]  Argument may help clarify instructions or ameliorate defects in them.[71]  And the spoliation theme of Todeschi's argument was supported by one of the jury instructions that *was* given, informing the jury that "[i]f weaker and less satisfactory evidence is offered when it appears that stronger and more satisfactory evidence was within the power of one party to produce, the evidence offered should be viewed with caution."

We conclude that the jury was made well aware that it was free to draw an adverse inference from missing telephone records, billing records, and emails and that the instructions that *were* given did not conflict with this perception.  The burden of proving prejudicial error rests on the appellant.[72]  On this record we cannot say that the lack of a permissible adverse inference instruction probably affected the jurors'

---

[70]  Todeschi's counsel argued that records of communications in a certain time period had "gone poof" and that "[c]oincidentally, or not so coincidentally, Halloran testified that he destroyed [legal bills] about the same time the lawsuit in this case was filed"; that a deleted email from Halloran to Brokaw "might have also had a message" acknowledging the illegality of "the job description with the 250-pound lifting requirement"; that Halloran had "a severe credibility problem" because he had "admitted that his law firm and Brokaw had destroyed evidence in this case, including his own billing records and attachments to e-mails," leaving the jury with "unrefuted" evidence that Sumitomo had retaliated against Todeschi for pursuing his worker's compensation claim; and that the destruction of emails and phone records "to confirm that [Sumitomo] did anything" was "an uncommon thing to happen" — "it is not usual to have records destroyed, people admitting they destroyed them."

[71]  *See Riley v. State*, 60 P.3d 204, 208 (Alaska App. 2002) ("[W]e have repeatedly held that ambiguities and potential flaws in jury instructions can be cured by the arguments of the parties."); *Norris v. State*, 857 P.2d 349, 355 (Alaska App. 1993) ("The parties' arguments can cure defects or omissions in jury instructions.").

[72]  *City of Kodiak v. Samaniego*, 83 P.3d 1077, 1082 (Alaska 2004).

judgment. We therefore conclude that any error in failing to give such an instruction must have been harmless.[73]

D. **We Cannot Conclude That The Jury Instruction Arguably Raising An Untimely Statute Of Limitations Defense Probably Affected The Verdict.**

Todeschi alleged that the former human resources manager at Pogo Mine, Kim Witt, threatened him in 2008 that if he continued to pursue a worker's compensation claim based on his 2007 injury "[t]here would be repercussions, up to and possibly including [Todeschi's] job." This allegation, he contended, supported his claim that he was fired in 2010 in retaliation for his resurrection of the workers' compensation claim. On appeal he argues that Jury Instruction 12 unlawfully complicated his workers' compensation discrimination claim by advising the jury of a statute of limitations defense that Sumitomo had never actually raised. The instruction provided:

> You have heard testimony that Kim Witt engaged in certain conduct. *Sumitomo cannot be held responsible for Witt's conduct before 2009.* However, if you find that Witt engaged in certain conduct before 2009 you may (but need not) further find that it provides context for Sumitomo's actions or omissions in 2010.

(Emphasis added.) The statute of limitations for workers' compensation discrimination claims is two years, and Todeschi brought his claim in February 2011.[74]

---

[73]    *Id.* (stating that we evaluate whether an erroneous jury instruction "was prejudicial by putting ourselves 'in the position of the jurors and determining whether the error probably affected their judgment' " (quoting *Gen. Motors Corp. v. Farnsworth*, 965 P.2d 1209, 1214 (Alaska 1998))).

[74]    AS 09.10.070(a) ("Except as otherwise provided by law, a person may not bring an action . . . upon a liability created by statute . . . unless the action is commenced within two years of the accrual of the cause of action.").

Sumitomo never raised a statute of limitations defense before trial. The assertion of a defense for the first time mid-trial, by way of a jury instruction, would likely be unfairly prejudicial.[75] We note that Sumitomo took advantage of the jury instruction to argue in its closing that "Mr. Witt's conduct cannot form the basis of a finding against Sumitomo in this case. That's because of statute of limitations issues."

On the other hand, as Sumitomo argues, there was no apparent reason for it to assert the statute of limitations as an affirmative defense before trial. The causes of action Todeschi alleged in his 2011 complaint and pursued at trial were based on his termination in 2010.[76] Witt's alleged conduct in 2008, as described in Todeschi's complaint, was relevant to Todeschi's claim that he had been unlawfully terminated for pursuing a workers' compensation claim, but the challenged jury instruction specifically allowed the evidentiary use of Witt's conduct to "provide[] context for Sumitomo's actions or omissions in 2010." Accordingly, Todeschi's counsel relied heavily on Witt's actions in his closing argument, telling the jury that "Sumitomo, here in court, did not seriously contest that Kim Witt threatened Todeschi with his job, and that Todeschi acquiesced only under pressure"; that Witt's threat was realized when Todeschi renewed

---

[75] *Barrett v. Byrnes*, 556 P.2d 1254, 1255 (Alaska 1976) (holding that defendants waived a statute of limitations defense when it "was not raised prior to trial or in the opening statements of the appellee, but rather for the first time after the appellant had rested her case" (internal citation omitted)). *But see Blake v. Gilbert*, 702 P.2d 631, 638-39 (Alaska 1985) (holding that the superior court did not abuse its discretion by allowing a defendant to raise a new statute of limitations defense in his amended answer because raising it before trial did not prejudice the plaintiff, distinguishing *Barrett*), *overruled on other grounds by Bibo v. Jeffrey's Rest.*, 770 P.2d 290 (Alaska 1989).

[76] The trial court asked Todeschi what damages he suffered from Witt's alleged threat in 2008, to which he responded, "[A]t that point it's accumulating medicals that aren't being paid for." He did not seek medical expenses as damages in this case, and they do not appear relevant to his claims for wrongful termination.

his pursuit of the workers' compensation claim in 2010; and that "given Witt's threat and the termination that quickly followed the reassertion of his compensation claim, it certainly appears to have been at least one of the substantial factors in [Sumitomo's] decision to sack Mr. Todeschi."

Todeschi does not dispute that the jury was properly instructed on the elements of his workers' compensation discrimination claim. And Instruction 12 expressly preserved the jury's ability to consider Witt's conduct when deciding that claim. To the extent the instruction at the same time precluded the jury from holding Sumitomo responsible for Witt's conduct, we agree that it presents an ambiguity — one that could have been compounded by Sumitomo's mention in closing argument of a statute of limitations defense it had never pleaded. But even if erroneous, Instruction 12 "is grounds for reversal only if it caused prejudice."[77] We determine prejudice by putting ourselves "in the position of the jurors and 'determin[ing] whether the error probably affected their judgment.' "[78] Reading the jury instructions as a whole,[79] and considering the parties' arguments to the jury about the evidence they should consider in deciding Todeschi's claims, we cannot conclude that the jury's verdict was probably affected by the ambiguity in Instruction 12. It is not probable that the jury believed it was precluded

---

[77] *City of Hooper Bay v. Bunyan*, 359 P.3d 972, 978 (Alaska 2015) (quoting *Thompson v. Cooper*, 290 P.3d 393, 398-99 (Alaska 2012)).

[78] *Id.* (quoting *Thompson*, 290 P.3d at 399).

[79] *Id.* ("When reviewing a trial court's denial of a proposed instruction, our inquiry focuses upon whether the instructions given, when read as a whole, adequately inform the jury of the relevant law." (quoting *Thompson*, 290 P.3d at 398)).

from considering Witt's conduct in 2008 in deciding whether Sumitomo was liable for its own conduct in 2010 in terminating Todeschi's employment.[80]

## V.    CONCLUSION

We AFFIRM the judgment of the superior court.

---

[80]    Todeschi also argues "that the [superior court] should have given an instruction that permitted an award of emotional distress damages" for his claim for breach of the covenant of good faith and fair dealing "under the unique facts of this case."  Such damages are not ordinarily recoverable on contract claims.  *See Hancock v. Northcutt*, 808 P.2d 251, 258-59 (Alaska 1991) (discussing the types of contracts, "highly personal and laden with emotion," that may present exceptions to the general rule precluding emotional distress damages in contract actions).  Todeschi's minimal briefing of the issue gives us no basis on which to conclude that the superior court erred.  *See Hagen v. Strobel,* 353 P.3d 799, 805 (Alaska 2015) ("[W]here a point is given only a cursory statement in the argument portion of a brief, the point will not be considered on appeal." (alteration in original) (quoting *Glover v. Ranney*, 314 P.3d 535, 545 (Alaska 2013))).